**Armen De FILIPPO and Sheldon Fleishman t/a A&S a Partnership**

**v.**

**FORD MOTOR COMPANY, a Delaware corporation, et al.**

**Civ. A. No. 70–1003.**

United States District Court,
E. D. Pennsylvania.

June 14, 1974.

Walter W. Rabin, Meltzer & Schiffrin, Philadelphia, Pa., for plaintiffs.

H. Francis De Lone, Dechert, Price & Rhoads, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

NEWCOMER, District Judge.

The present case was tried to a jury on four causes of action, all arising from the same basic set of operative facts, between October 1 and November 13, 1973. On November 15, 1973, the jury returned a verdict in favor of plaintiffs on their Sherman anti-trust[1] claim and on their contract claim; the jury found for plaintiffs on their Automobile Dealers' Day in Court Act[2] claim, but also found that plaintiffs suffered no damages because of defendant's violation. Accordingly, the Court entered judgment for defendant on this claim, as well as on the contract claim,[3] since the jury's answers to the special interrogatories revealed that the Statute of Frauds would bar any contractual recovery.[4] The Court entered judgment in favor of plaintiffs on the anti-trust claim, and trebled the damages awarded by the jury, which were $750,000, to $2,250,000.

Both parties have moved under Rules 50 and 59 of the Federal Rules of Civil Procedure for the grant of judgment n. o. v. or a new trial as to the various judgments entered. Defendant asserts that the plaintiffs' verdict on the anti-trust claim was based on insufficient ev-

1. 15 U.S.C.A. § 1 et seq.

2. 15 U.S.C.A. §§ 1221–1225.

3. Although the Court described this judgment as a judgment non obstante veredicto at trial, it would be more correct to categorize the Court's action as "molding . . . the verdict as a matter of law . . .," Millard v. Municipal Sewer Authority, 442 F.2d 539, 542 (3rd Cir. 1971), since the jury was not instructed as to the Statute of Frauds and thus could not be said to have applied all the law to the facts. See 5A Moore's Federal Practice ¶ 49.02 (2d ed.) at 2206: "The procedure [special interrogatories] leaves to the trial judge the responsibility of applying appropriate legal principles to the facts found by the jury and the jury need not be instructed concerning the legal principles which the judge will apply to the facts found by them."

4. The Court had already directed a verdict in favor of defendant as to plaintiffs' fourth cause of action, which was based on an alleged obligation by Ford to return to plaintiffs the value of their equity in Chestnut Motors. The Court had also, upon the completion of defendant's case, directed verdicts in favor of Presidential Ford, Inc. and Ford Leasing Development Company on all four of plaintiff's causes of action.

idence and was contrary to law, justifying the entry of judgment n. o. v. It also asserts that this Court committed a series of errors in admitting evidence before the jury or in instructing the jury, justifying a new trial. Plaintiffs attack the Court's charge and interrogatories to the jury on the anti-trust claim while supporting the jury's verdict. Plaintiffs move to amend the entry of judgment in favor of defendant on the contract claim, so as to allow recovery on this claim, and they also move for a new trial on their Dealers' Day in Court Act claim. Before addressing the arguments in support of and in opposition to these motions, it would be wise to sketch the facts from which these claims, and the jury's decisions on them, arose.

### Factual Background

Plaintiffs in this case, Armen De Filippo and Sheldon Fleishman, became Ford dealers at Chestnut Motors in West Philadelphia under an arrangement known as a "Dealer Development Dealership," in which plaintiffs put up 20% of the capital, Ford put up the rest, and plaintiffs were obligated to buy out Ford's share with the dealership's profits over a specified period of time. The record shows that plaintiffs succeeded in ending Chestnut Motor's history of losses, although because of an accountant's error, plaintiffs' profit margin was not as great as was originally thought.

On October 15, 1969, approximately eight months after plaintiffs began managing the dealership, Chestnut's main showroom, service department, parts department, and general offices were destroyed by fire.

During the negotiations between plaintiffs and Ford that followed the fire over the possibility of plaintiffs acquiring another Ford dealership, the parties focused on Presidential Motors, a "factory" (Ford owned and operated) dealership located on the fringe of Philadelphia which had shown consistent losses. The sale of Presidential to plaintiffs as private dealers was attractive to Ford because it had received complaints from nearby private Ford dealers that Presidential's subsidized losses were detracting from their sales. However, it appeared that even the dealer development program would not present attractive enough terms to induce plaintiffs to take over Presidential. Consequently, plaintiffs and Ford representatives worked out an arrangement whereby plaintiffs would postpone their investment until they had operated Presidential (and, hopefully, brought it into the black) for three months and would defer substantial parts of their rent payments to Ford until the last years of their lease.

During the negotiations these terms were embodied in the form of a buy-sell agreement, but between the conclusion of these negotiations on December 12, 1969, and the plaintiffs' meeting with Ford Representatives on December 18, 1969, at which plaintiffs testified they expected the Presidential contract to be concluded, Ford officials changed the form of agreed terms from a buy-sell agreement into a proposed offer by plaintiffs to purchase Presidential's assets. This change was ordered by Mr. Dewitt, Supervisor of Ford's Dealer Investment Services, and was effected by tearing off the first page of the buy-sell agreement and substituting a letter delineated an "offer to purchase," to which the remaining pages of the buy-sell agreement were attached as an appendix. Plaintiffs were not informed of this change.

At the December 18, 1969 meeting, Ford representatives indicated to De Filippo [4a] that the deferred rent part of the negotiated package would have to await approval by Leaseco, Ford's subsidiary in charge of leasing operations. De Filippo became angry and threatened to back out on the whole deal, whereupon George Brandtz, Esquire, of the law

---

[4a]. At this time Fleishman was attending his sick wife, and De Filippo was handling affairs for both men.

firm of Wolf, Block, Schorr, and Solis-Cohen, in whose offices the December 18th meeting was being held, suggested that the offer to purchase Presidential's assets (which De Filippo but not defendant had signed) be held in escrow pending Leaseco's approval of the deferred rent terms. This suggestion was accepted by both parties.

Plaintiff De Filippo testified at trial that he was not told of the change from a buy-sell agreement to an offer, and that he was led to believe by Ford representatives, some of whom he had relied upon in the past in his business affairs, that a complete agreement had been entered into between himself and Ford, contingent only upon Leaseco's approval. He also testified that he thought Mr. Brandtz was representing both himself and Ford, since Wolf, Block, Schorr and Solis-Cohen had acted as attorney for Chestnut Motors in the past. Mr. Brandtz testified that he was acting solely for Ford, the seller, and Chestnut Motors, the buyer, of which plaintiff was only a minority stockholder. It was undisputed, however, that Mr. Brandtz did not tell De Filippo that he was not representing him.

The time fixed at the December 18th meeting for plaintiffs' becoming managers at Presidential was January 5, 1970. Between December 18th and January 5th, Ford received complaints from several Philadelphia-area Ford dealers about the "special terms," namely, the postponed investment and deferred rent contained in the proposed arrangement between plaintiffs and Ford.[5]

On December 29, 1969, Leaseco approved plaintiffs' deferred rent terms. Plaintiffs prepared to move into Presidential on January 5, 1970, but were held off at the last minute by Ford management personnel. On January 9, 1970, Mr. Naughton, a Vice-President of Ford and General Manager of its Ford Division, flew from Detroit to Philadelphia to attend a meeting of the Philadelphia-area Ford dealers. At that meeting, which neither plaintiff attended, Naughton assured the dealers that the sale of Presidential would not be made to plaintiffs on the terms discussed above.

Subsequent to this meeting, Ford offered plaintiffs Presidential without these terms, but plaintiffs refused. Plaintiffs and Ford also negotiated over the acquisition of a third Philadelphia-area dealership, Circle Ford, but these negotiations proved fruitless. On April 10, 1970, Ford terminated plaintiffs' franchise at Chestnut Motors. There was evidence that this termination was the result of plaintiffs' refusal to sign a waiver of any legal claims they might have arising out of the aborted Presidential transaction.

### The Verdicts

Plaintiffs sued Ford (and a number of its subsidiaries) under the Sherman Act, 15 U.S.C.A. § 1, alleging that Ford had conspired with its dealers to prevent plaintiffs from becoming dealers at Presidential; under the Automobile Dealers' Day in Court Act, 15 U.S.C.A. §§ 1221–1225, alleging that in threatening to terminate unless plaintiffs signed a general waiver, defendant acted in bad faith; and upon a contract theory, alleging that an oral contract between plaintiffs and Ford could have come into existence on three separate occasions between December 18, 1969, and January 5, 1970, and that Ford's refusal to permit plaintiffs to enter into the operation of Presidential constituted a breach of such contract. Plaintiffs also claimed that a return of their equity in Chestnut Motors as of the date of the fire was due them. However, the Court, reasoning that defendant could only have been obligated to pay plaintiffs the October 15th value of their equity as part of a contract with plaintiffs for the sale of Presidential, and that any equity return would be subsumed in the damages for the breach of any such contract, directed a verdict in favor of defendant on the

---

5. The sale was actually to be made to Presidential Motors, Inc. to Chestnut Motors, Inc.

return of equity claim at the close of the evidence.

The jury found that Ford's failure to deal with plaintiffs on the terms outlined in the document which plaintiffs signed on December 18, 1969, was the result of a conspiracy between Ford and its Philadelphia-area dealers. The jury found that this conspiracy was not motivated by purpose of totally preventing plaintiffs from becoming Ford dealers in the Philadelphia area, but that it did constitute an unreasonable restraint of trade.

The jury found that a contract for the sale of Presidential Motors had been entered into between plaintiffs and Ford on December 18, 1969 (contingent only upon Leaseco's approval of the deferred rent terms). However, since the jury found that Ford's representatives at the December 18th meeting did not intentionally fail to disclose the fact that the document plaintiffs were signing had been changed into an offer, the Court decided that there was no reason why the Statute of Frauds should not be applied, and judgment for defendant was entered on the contract claim.[6]

As to plaintiffs' Dealers' Day in Court Act claim, the jury found that defendant violated that Act both in threatening to terminate and in terminating the Chestnut franchise because plaintiffs would not sign a general release. However, the jury also found that the Chestnut franchise had no value as of the date it was terminated. Consequently, the Court entered judgment in favor of defendant on this claim as well.

We will deal with plaintiffs' and defendant's motions on a claim-by-claim basis.

*The Anti-trust Claim*

I. *Defendant's Motion for Judgment N.O.V.*

Defendant moves for the entry of judgment n. o. v. on plaintiffs' anti-trust claim, claiming that the jury's finding that the agreement between defendant and the Ford dealers was not the expression of a purpose to totally exclude plaintiffs from any and all Philadelphia-area Ford dealerships precludes that agreement from being considered a *per se* violation of the Sherman Act. As to the jury's finding that this agreement constituted an unreasonable restraint of trade, defendant argues that there was insufficient evidence presented at trial to support such a finding. Finally, defendant requests judgment n. o. v. on the grounds that the agreement found by the jury in interrogatory No. 1 was reasonable as a matter of law.

We are persuaded upon an examination of the standards for determining the reasonability of a restraint that there was insufficient evidence to warrant the jury's finding that the agreement in question constituted an unreasonable restraint of trade.

Defendant has cited several cases [7] in support of the proposition that proof of an unreasonable restraint requires extensive statistical evidence as to the kinds of goods or services with which the product subject to the restraint effectively competes, the geographic market in which it effectively competes, the percentage of the market affected by the alleged restraint, the size and strength of the competition, the existence or nonexistence of barriers to entry and the effect of the practice thereon, the pur-

---

6. The Court had submitted the question of intentional failure to disclose to the jury on the theory that the Court should not allow the Statute of Frauds to be used in defense of a fraud. *See* Simplex Precast Industries, Inc. v. Biehl, 395 Pa. 105, 149 A.2d 121 (1959).

7. The three cases among those cited by defendant in which the Supreme Court actually applied the rule of reason test were United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1952); Chicago Board of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918).

pose behind the alleged restraint, and the effect of the restraint on price or availability of products.

Except on the matter of the purpose behind the restraint, plaintiffs herein offered little or no evidence as to any of the above elements of a rule of reason violation. No evidence was presented as to the effect of the restraint on interbrand competition (among dealers), which is required by the United States v. Arnold, Schwinn [8] case. No evidence was presented on the percentage of the relevant product market [9] affected by the alleged restraint, the existence of barriers to entry and the effect of the practice thereon, or the effect of the restraint on the price or the availability of the affected product.

As plaintiffs' counsel declared to the Court immediately before the Court's deliverance of its charge:

"Plaintiffs offered no evidence whatsoever during the trial that the particular conspiracy involved in this case did constitute an unreasonable restraint of trade."

". . . We did not try to prove as a matter of fact unreasonable restraint of trade because as the cases which we have cited and quoted say, to prove unreasonable restraint of trade would require just an incredible amount of evidence. It would have taken us maybe weeks or months, and this is right in the quote that I submitted to Your Honor.

That is the reason why in per se violations such as group boycotts you do not have to prove it. So you put us in a position where you are submitting an issue of fact to the jury which we didn't try to prove. We have to lose on that because we never tried to prove it because it is not an issue of fact, sir, it is an issue of law."

At the time of these statements we believed that plaintiffs' counsel was exaggerating his predicament in order to persuade the Court to submit his case to the jury as a group boycott case. However, after examining the parties' briefs and the transcripts, the Court is persuaded that plaintiffs' counsel was candidly stating his failure (indeed lack of attempt) to prove a rule of reason violation.

If we were to agree with defendant that the jury's answer to interrogatory No. 2 defeated *per se* liability, our finding that there was insufficient evidence to support the jury's finding of unreasonableness would compel us to enter judgment in defendant's favor. However, we do not agree with defendant for the reasons discussed below.

When this Court originally submitted the special interrogatories on the antitrust claim to the jury, we were of the opinion that Ford could not be held liable on the basis of a finding of conspiracy alone. This was because Ford's refusal to deal with plaintiffs, even if it was the result of an agreement between Ford and its Philadelphia-dealers, did not resemble those kinds of situations which the courts had found to be "naked restraints of trade" and thus illegal without need of further inquiry into their effects on competition. United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). This was because Ford refused to deal with plaintiffs on terms which we then believed to be more favorable than those offered by Ford to its other dealers, whether prospective or incumbent. Since the *per se* group boycott cases had dealt with agreements to refuse to deal with a plaintiff at all or only upon *less* favorable terms than those offered to others, it was felt that

---

8. 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967).

9. There was testimony from other Ford dealers and plaintiffs which would support a

finding that the relevant geographic market was the "Philadelphia area" or "Greater Philadelphia area," and it was so defined in the Court's charge.

the instant situation could not be considered to come within the *per se* group boycott category.

The Court was led to this conclusion by the reasoning as well as the facts of the group boycott cases. The pernicious effects which the Supreme Court inferred from the inherent nature of a group boycott were best set out in the Court's decision in *Klor's*:

"This [group boycott] takes from Klor's its freedom to buy appliances in an open competitive market and drives it out of business as a dealer in the defendants' products. It deprives the manufacturers and distributors of their freedom to sell to Klor's at the same prices and conditions made available to Broadway-Hale and in some instances forbids them from selling to it on any terms whatsoever." 359 U.S. at 213, 79 S.Ct. at 710.

The present agreement did not appear to take from plaintiffs their access to Ford dealerships in an "open competitive market;" it merely prevented plaintiffs from acquiring a dealership on special terms. Nor did the present agreement seem to deprive Ford of its freedom to sell to plaintiffs "at the same prices and conditions made available to [its other dealers]." 359 U.S. at 213, 79 S.Ct. at 710.

An additional factor that led to the conclusion that the present situation did not resemble the situations condemned by the group boycott *per se* cases was plaintiffs' exclusion from only one source of supply of defendant's product. It was the Court's understanding that the group boycott cases had involved either exclusion from a market or denial of access to a line of merchandise. In *Klor's*, cited *supra*, plaintiffs were denied access (or allowed access on discriminatory terms only) to the appliances sold by the manufacturer-members of the conspiracy; in *General Motors*, cited *supra*, certain dealers were prevented from selling to discounters entirely (and discounters were denied access to General Motors cars); in Fashion Originators' Guild v. Federal Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941), certain retailers were totally denied access to the products of Guild members. The agreement between Ford and its dealers not to deal with plaintiffs on the negotiated terms denied plaintiffs access to only a portion of defendant's product.[10] Absent a finding that the agreement was motivated by a desire to deny plaintiffs access to defendant's entire product, rather than merely one outlet, it was felt that plaintiffs had not been the victims of the kind of restraint condemned without further inquiry by the group boycott cases.

Throughout trial, defendant maintained that a finding of agreement not to deal with plaintiffs did not constitute a *per se* violation unless the jury also found that this agreement had been motivated by a purpose to exclude plaintiffs from becoming Philadelphia-area Ford dealers on any terms. Whether plaintiffs had been offered more or less favorable terms than those offered to other dealers, or whether plaintiffs had been excluded from access to a fraction or all of defendant's products, is irrelevant to this argument. Defendant contends that even an agreement to deal with plaintiffs on only discriminatory terms would not qualify as a *per se* violation unless a purpose to exclude plaintiffs from the market was also found. Defendant bases this argument on the case of Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke and Liquors, Ltd., 416 F.2d 71 (9th Cir. 1959), cert. denied 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970), which in dictum declared that in all the Supreme Court group boycott cases ". . . there was a purpose either to exclude a person or group from the market, or to accomplish some other anti-competitive objective, or both." 416 F.2d at 76.

---

10. This is true whether the relevant product is seen as wholesale Ford vehicles or Philadelphia-area Ford dealerships.

This Court believes that defendant too narrowly construes *Seagram* when it states that that case requires a finding of purpose to exclude rather than an "anti-competitive purpose" in general. Nevertheless, assuming arguendo that defendant's construction is correct, the Court rejected it before trial and continues to reject it now.

It is this Court's belief that an "anti-competitive purpose" as stated by the *Seagram* case can generally be presumed in a situation where there is a concerted refusal to deal with a party on any terms or only on unfavorable terms, and that no specific finding of anti-competitive purpose, let alone a purpose to entirely exclude from the market, need be made. While there are special situations in which this presumption cannot be made, such as the situation faced in *Seagram* or by the Third Circuit in Ark Dental Supply Co. v. Cavitron Corp., 461 F.2d 1093 (1972), we do not feel that the present situation is one of them.[11] Plaintiffs were not exclusive distributors facing replacement by another exclusive distributor. The Court is aware that this Circuit has commented favorably on the reasoning of the *Seagram* case, *Ark Dental*, cited *supra*, but we believe that this was done only insofar as it applied to the exclusive distributor situation. Should we be wrong, the jury's answer to the second interrogatory would allow the appellate court to correct our error without the need of a new trial.

This Court did submit to the jury the question of whether the agreement, if any, was motivated by a purpose to exclude plaintiffs from the market (interrogatory No. 2). But this interrogatory was submitted not on the theory that it was prerequisite to a finding of *per se* liability but that it was an alternative basis for such a finding. A concerted refusal to deal, whether or not it fits the outlines of a group boycott as defined by the group boycott cases (see discussion in pp. 9–10, supra), would undeniably be a *per se* restraint were it found to be the expression of a purpose to totally exclude a competitor [12] from the market.

Thus, the jury's answer to the second interrogatory does not preclude a finding that the agreement between Ford and its Philadelphia-area dealers constituted a *per se* violation of the Sherman Act. Upon a re-examination of the record and with the benefit of able and extensive briefing and oral argument of counsel for both parties, the Court has concluded that the facts of this case bring it within the group boycott *per se* liability category.

As noted above, it was originally thought that the terms offered plaintiffs for the purchase and operation of Presidential were not offered to other neighboring Ford dealers. However, there was testimony that these terms, or substantially equal terms, were offered to the other dealers. The record reveals that on December 30, 1969, a meeting was held between Ford's regional representatives and certain Philadelphia-area Ford dealers for the purpose of discussing the terms of the proposed sale of Presidential to plaintiffs. A number of these dealers left this meeting with suspicions that plaintiffs were receiving preferential treatment.

---

11. In both *Seagram* and *Ark Dental*, the Court was faced with an agreement between manufacturers to replace one joint exclusive distributor with another. The losing distributor sued, alleging a group boycott between both manufacturers and the triumphant distributor. The Third Circuit stated:

"[I]t is indisputable that a single manufacturer or seller can ordinarily stop doing business with A and transfer his business to B and that such a transfer is valid even though B may have solicited the transfer and even though the seller and B may have agreed prior to the seller's termination of A." (461 F.2d at 1094)

12. Although plaintiffs competed with the other dealers and not Ford, the latter can be held solely liable for the bad purposes of its coconspirators. E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee, 467 F.2d 178 (5th Cir. 1972), cert. denied, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973).

One of the dealers who had attended the December 30 meeting, Kerry Pacifico, subsequently contacted Ford's Dealer Policy Board, the bureau officially responsible for dealer-corporation relations, to protest the terms of the proposed sale. There was evidence that this dealer threatened to bring suit, presumably under the Robinson-Patman Act,[13] because of Ford's allegedly preferential treatment of plaintiffs. On January 6, 1970, the members of the Dealer Policy Board travelled from Michigan to Philadelphia to meet with this dealer. Unable to mollify him, they instructed Ford's management for the Philadelphia region that terms similar to those being offered plaintiffs would have to be offered to the other dealers in the Philadelphia-area in order to protect Ford from a Robinson-Patman suit. These instructions were based upon advice given to the Policy Board members by Ford's legal counsel, and were apparently ratified by the officer in charge of the Ford Division of the Ford Motor Company, John Naughton. (N.T. p. 3984, 3986).

On January 7, 1970, certain Philadelphia Ford management personnel met with Mr. Pacifico. At this meeting they informed this dealer that they would extend him rent terms identical to those being proposed to plaintiffs even though it meant that Ford would have to buy Pacifico's land and become his landlord in order to put these terms into effect. These Ford officials indicated that such an arrangement would also be offered to all the neighboring Ford dealers. The dealer, expressing a clear lack of enthusiasm for taking Ford on as a landlord, rejected this offer, and remained constant in his criticism of the "special terms" being offered plaintiffs. The following testimony was elicited from the Ford representative who conducted this meeting:

"Q. O.K. Well, this problem that you considered the most important one, the one about the deferred rent that if you offered it to Armen and Shelley [DeFilippo and Fleishman] you'd have to offer it to everybody?

A. Yes.

Q. Well, you kind of already had gone partway on that in your January 7th meeting with Mr. Pacifico. You'd already told him that if the deal went through with Armen and Shelley he could have the same deal and you'd buy his place?

A. Yes.

Q. So why was that still a problem? In fact, that decision had been made to tell the dealers, hadn't it, because you told one of them?

A. Well, that was the next day after the Policy Board told me and Mr. Barclay and Mr. Curran, I believe— Mr. Barclay confirmed that I had to tell them.

Q. All right. Then, in fact, by January 9th, he already had told you, so you kind of crossed the Rubicon?

A. I told one dealer. I made one contract. I had 29 more to make.

Q. Right, but that one dealer was Kerry Pacifico who was pretty much the acknowledged leader, and I think you realized, didn't you, if you told Kerry he was going to tell all the other dealers?

A. Yes." (N.T. pp. 3991–3992).

On January 9, 1970, during a meeting at which most of the Philadelphia-area dealers were present, John Naughton announced that Ford would not go through with the proposed deal with plaintiffs. But even after this announcement was made, Ford personnel extended terms similar to those offered plaintiffs and Pacifico to other Ford dealers (N.T. pp. 2604–2605).

It is true that one of the "concessions" offered plaintiffs was permission to defer their investment in Presidential until they had operated it for three months, and that this feature was never offered to the other dealers. But

13. 15 U.S.C. § 13 (1936).

it does not appear that such a proposal could have been offered to dealers who had already made their investments. In offering to buy the dealers' land and rent it back to them on a deferred basis, Ford had gone a long way towards equalizing its treatment of plaintiffs and its treatment of the other dealers. And while it is also true that these terms may have been offered to the other dealers subject to Ford management's ultimate approval of the terms offered to plaintiffs, this qualification becomes irrelevant when it is remembered that the terms offered plaintiffs were also subject to ultimate approval by Ford's management. An agreement to refuse to deal with a party on equal terms with other customers is not less than a *per se* violation merely because those terms are proposed rather than the subject of a binding contract.

As for the assumption that a plaintiff must either be excluded from a market or completely denied access to defendant's product by an agreement before that agreement rises to the level of a *per se* violation, plaintiffs' counsel have advanced several decisions which support the conclusion that less than total exclusion or denial of access is required. Ricci v. Chicago Mercantile Exchange, 447 F.2d 713 (7th Cir.), aff'd, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973); Ford Motor Co. v. Webster's Auto Sales, 361 F.2d 874 (1st Cir. 1966).

In *Ricci,* the Seventh Circuit held that a commodities broker had been the victim of a group boycott when the president and certain members of the Chicago Mercantile Exchange agreed to remove plaintiff's Exchange membership in violation of Exchange by-laws. The Court ruled that the facts alleged in plaintiff's complaint made out a *per se* violation even though plaintiff obtained another membership three weeks later. However, the Circuit Court stayed the

anti-trust action pending administrative proceedings under the primary jurisdiction doctrine. The Supreme Court affirmed the lower court's finding that primary jurisdiction lay with the administrative agency.

In Ford Motor Co. v. Webster's Auto Sales, cited *supra,* plaintiff was a used car dealer who had succeeded in acquiring "factory Fords" (vehicles made available to Ford employees for their own use) from Ford dealers on a wholesale basis. A Ford dealer complained about this practice to Ford and Ford attempted to stop its dealers from reselling factory Fords to plaintiff (at least at wholesale). The District Court found a *per se* group boycott and the Circuit affirmed, even though plaintiff had only been denied access to a portion of defendant's product.

■ Based on these decisions, the Court believes that a *per se* violation of the Sherman Act can be made out by an agreement which denies access to only one source of supply of defendant's product.

Defendant asserts in support of its motion for judgment n. o. v. that the agreement to refuse to deal with the plaintiffs at Presidential on the terms set forth in plaintiffs' offer was reasonable as a matter of law. Defendant cites a number of instances in which courts have held that an agreement between a manufacturer and a distributor to shift the manufacturer's exclusive distributorship to that dealer from another dealer was not an unreasonable restraint of trade. The present case does not involve an exclusive dealership,[14] however, and none of the cases referred to by defendant involve, as does the present case, a situation in which a group of plaintiffs' competitors combine with a manufacturer to interfere with plaintiffs' attempt to secure a distributorship.

---

14. The replacement of one exclusive distributor by another necessarily involves the total exclusion of a competitor from the affected product's market.

## II. *Defendant's Motion for a New Trial*

Defendant has moved for a new trial on the basis of several alleged errors by the Court. We will deal with these seriatim.

### a. Defendant's first three asserted bases for a new trial.

Defendant's claims that it was prejudiced because plaintiffs' pretrial memorandum did not mention a rule of reason theory of liability, that the Court's charge on reasonableness was erroneous and that the Court's third interrogatory was erroneous, are no longer relevant since the Court has ruled that no rule of reason violation has been proven. Therefore, we will proceed to discuss defendant's new trial motions that concern damage evidence.

### b. Errors concerning Admission of Plaintiffs' Expert's Testimony concerning the value of plaintiffs' interest in Presidential.

#### i. No basis in record for assumption that Presidential would show $84,000 profit in first year (after its sale).

■ Defendant attacks the figure of $84,000, which plaintiffs' two experts relied upon in computing damages, as having no basis in the record establishing it as Presidential's first year's profits under new management. The $84,000 figure was taken from a profit forecast prepared by Ford to be shown to potential buyers of Presidential. (The forecast was prepared on August 18, 1970, almost nine months after the agreement not to deal with plaintiffs). Defendant points out that this document predicts a first-year profit of $19,555 and a "going year" profit of $84,447, and that it was based on factors which did not conform to the arrangement plaintiffs had offered.

In spite of defendant's arguments, the Court feels now as it did at trial that this forecast provided a reasonable basis for plaintiffs' use of the $84,000 figure.

Defendant had the opportunity to, and did, argue to the jury the factors underlying the profit forecast which were not reflected in plaintiffs' proposed arrangement for operating Presidential. Defendant also presented testimony by a Ford officer, Mr. Curran, which, based on an adjustment of the forecast to fit plaintiffs' theoretical operating situation, revealed a much lower profit prediction.

#### ii. Plaintiffs' experts' projections.

■ Defendant objects to the admission of the testimony of plaintiffs' expert Professor Adams, who projected an increase in Presidential's profits of 7% over a twenty-year period, based on Adams' predictions that national income would increase 7% (6% in the Philadelphia area) and national consumer purchases of automobiles and parts would increase 7% over the same twenty-year period, namely, 1970–1990. Defendant attacks these projections on two levels, the first being that Adams' projections of the 6% and 7% increases lacked the foundation required by the Third Circuit in Hoffman v. Sterling Drug, Inc., 485 F.2d 132 (1973), and the second being that, assuming these increases to be valid, there was no basis in the record for assuming, as Professor Adams did, that any increase in Presidential's profits would exactly mirror either of these increases.

Defendant's first challenge—that Adams' projections for future national income and automobile purchases was inadmissible speculation—construes too narrowly the *Hoffman* test for the admissibility of evidence concerning future trends. In *Hoffman*, the Third Circuit ordered a new trial on the amount of compensatory damages because plaintiff was allowed to introduce a loss-of-wages projection calculated on the assumption that wages would continue to increase at the same rate that they had during the proceeding five years. The Court, noting that the case was ". . . marked by the total absence of any evidence of

probable future salary or economic trends", treated the assumption that the rate of inflation would remain constant as "speculation." In the present case, however, Professor Adams offered statistics concerning the past rate of growth of factors which would probably influence the future rate of growth of car purchases, as well as his opinion as to why these factors would continue into the future. These statistics provide the foundation for allowing Professor Adams to testify as to the 6% and 7% figures. The jury heard defendant cross-examine Adams on the probability that these projections would actually be realized including inquiries as to the impact of the fuel crisis and anti-pollution regulations on future Ford automobile purchases. It was for the jury, and not the Court, to decide whether it was probable that these projected increases were accurate; the *Hoffman* case only requires the Court to find that there is a reasonable basis for thinking that such increases are probable, and this Court was satisfied that Adams' testimony established such a reasonable basis.

As to defendant's challenge to Adams' link between these projected increases and the rate of increase of Presidential's profits, the Court was also satisfied that a reasonable basis was established by Adams' testimony for assuming a one-to-one relationship. Defendant was given ample opportunity to cross-examine Adams on the probability the relationship of national income and sales increases to the profit margins of Philadelphia-area dealers and, in particular, of Presidential Motors.

c. Remaining Grounds.

■ The Court believes that it can summarily deal with the other grounds which defendant offers in support of its motion for a new trial. There was a reasonable basis in the record for permitting plaintiffs' experts to make their

projections over a twenty-year period, and in permitting Professor Mendelson to include plaintiffs' bonus [15] in his valuation of plaintiffs' interest in Presidential Motors. Defendant was able to cross-examine plaintiffs' experts and other witnesses, as well as offering its own testimony, on the accuracy of these two assumptions.

■ Defendant charges that Professor Mendelson's evaluation of plaintiffs' interest in Presidential should have been excluded because he employed an improper discounting procedure. Professor Mendelson used a 6% simple interest figure in discounting the profits that Presidential Motors might have made to their present worth in valuing the value of plaintiffs' interest in 1970. Defendant raised this objection during trial at which time the Court ruled that plaintiffs would be permitted to use the 6% simple interest figure, but that defendants could cross-examine or offer counter-projections on a percentage figure which they felt more closely approximated the risk factor for the automobile industry. This Court's decision was based upon authority cited to it by defendant which stated that

". . . The discount rate applied should vary according to the amount of evidence *the trier of fact* has in the likelihood that the earnings level he has predicted actually would have been maintained. . . ."

Note, Private Treble Damage Antitrust Suits: Measure of Damages for Destruction of All or Part of a Business, 80 Harvard L.Rev. 1566, 1577 (1967).

While permitting plaintiffs to rely on the percentage figure, the Court did not remove the ultimate decision as to the reasonableness of the discount figure from the jury, and thus did not commit error requiring a new trial.

15. Defendant attacks Mendelson's inclusion of bonus in the value of plaintffs' interest on the grounds that it represented compensation rather than profits. But the definition of bonus as profits was taken from the Dealer Development contract prepared by defendant for plaintiffs' signature.

The Court also rejects defendant's assertions that its interrogatories and charge precluded the jury from considering defendant's "market price" approach to the valuation of plaintiffs' interest in Presidential Motors. (Defendant argued—and the Court charged the jury —that they could value plaintiffs' interest in Presidential in 1970 by the amount plaintiffs had offered to pay for, and the amount defendant had agreed to sell, Presidential, that is $84,000). Special Interrogatory No. 6 asked the jurors:

> "What percentage figure did you find appropriate in reducing to present value plaintiffs' share of projected future profits in determining the value of plaintiffs' share of Presidential Motors?"

This question was presented merely to identify the discount rate, if any, the jury used in case the Appellate Court disagreed with our ruling that a 6% simple discount rate was not required. Taken into consideration the arguments of counsel and this Court's charge, we do not feel that the submission of this interrogatory prejudiced the jury's consideration of both methods of valuing plaintiffs' interest. And, along these lines, the Court is not persuaded that its "fleeting" charge on the market value ($84,000) method of valuing plaintiffs' interest, given as it was in response to defendant's objection after the main charge, had less effect on the jury than the main charge. It could be said with equal force that what the jury heard last—and what was set apart from the rest—had a greater impact on them than material contained in the main charge.

The assertion that the jury's single damage verdict of $750,000 was grossly excessive concentrates on the market value approach to valuing plaintiffs' interest to the exclusion of the discounted profits approach of valuing that interest. The Court finds that the

award was well within reasonable bounds.

The Court's refusal to grant defendant's motion for a bifurcated trial as to liability and damages at the eve of trial was not error requiring a new trial, because such a bifurcation would have unduly hampered the presentation of plaintiffs' liability case.

Any and all arguments made by defendant in support of their motion for a new trial which are not discussed are hereby rejected.

e. Defendant's Motion for a New Trial under Rule 60(b)(2).

Subsequent to the period allowed for the filing of motions for judgment n. o. v. and new trial, defendant moved for a new trial on the basis of newly discovered evidence. F.R.Civ.P. 60(b)(2). Defendant claims that in examining the time sheets of plaintiffs' counsel which this Court declared it could do in connection with a hearing on counsel fees, it discovered evidence that contradicts the testimony of plaintiff DeFilippo at trial. The evidence which defendant offers is time sheets which show that DeFilippo [16] consulted attorney Jacob Siegal, a partner in plaintiffs' counsel's firm, on three separate occasions prior to March 1, 1970. At trial De Filippo testified that he did not "get an attorney" until after March 1, 1970.

Defendant contends that this new evidence entitles it to a new trial, presumably on the grounds that the new evidence might lead the jury to view the negotiations concerning a new dealership for plaintiffs that followed the ill-fated December 1969 negotiations over Presidential in a light more favorable to defendant. However, in order to justify a new trial under Rule 60(b)(2), the evidence in question must not have been previously discoverable by the exercise of reasonable diligence, must not merely discredit, contradict, or impeach a wit-

16. The time sheets show that plaintiff Fleishman met with this same counsel two times prior to March 1, 1970.

ness, and must be such as would probably change the outcome of the trial. Giordano v. McCartney, 385 F.2d 154 (3rd Cir. 1967); Baird v. Aluminum Seal Co., D.C., 149 F.Supp. 874, aff'd 250 F.2d 595 (3rd Cir. 1957).

We believe that defendant was not remiss in not finding this evidence before now. However, we feel that this evidence does not meet the other requirements established by the cases in this Circuit interpreting Rule 60(b)(2). The new evidence seems only to impeach the testimony of a witness, in this case the testimony of plaintiff DeFilippo. And it seems unlikely that the new evidence would change the outcome of the case, since it relates to events which occurred after the dates on which the jury found defendant had committed the violation for which it was held liable.

For these reasons, defendant's motion for a new trial under Rule 60(b)(2) will be denied.

### III. *Plaintiff's Motion for a New Trial*

Plaintiffs have moved for a new trial limited to the issue of damages on their anti-trust claim in the event and only in the event, that defendant is granted a new trial on this cause of action. Since defendant's motions for a new trial on this cause of action were denied, plaintiffs' contingent motion for a new trial will also be denied.

### IV. *Plaintiff's Motion for Reasonable Attorney Fees*

 We come now to the matter of determining the amount of reasonable attorney fees to be paid by defendant to the plaintiffs as is authorized by Section 4 of the Clayton Act, 15 U.S.C.A. § 15. Plaintiffs have requested that the Court award plaintiffs $500,000 in attorney fees.

At the threshold of any such determination is the question of what standard must be applied in arriving at an amount which represents reasonable attorney fees. Recent decisions of this and other circuits appear to have altered the traditional approach to fixing attorney fees. Lindy Bros. Builders, Inc. v. American Radiator and Standard Sanitary Corp., 487 F.2d 161 (3rd Cir. 1973); Merola v. Atlantic Richfield Co., 493 F.2d 292 (3rd Cir. 1974); Detroit v. Grinnell Corp., 495 F.2d 448 (2d Cir. 1974). Under the traditional standard, the number of hours spent by the successful attorney and his normal hourly billing rate were factors whose importance did not exceed such other factors as the complexity of the case or the ability of plaintiff's counsel. Noerr Motor Freight v. Eastern Railroad Pres. Conf., 166 F.Supp. 163 (E.D.Pa.1958). Several courts have held that the total time spent and average hourly rate factors should receive less weight than other factors such as those mentioned above. TWA v. Hughes, 312 F.Supp. 478, 483 (S.D.N.Y.1970) aff'd, 2 Cir., 449 F.2d 51, reversed on other grounds, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973); Hanover Shoe, Inc. v. United Shoe Machinery Corp., 245 F.Supp. 258, 303 (M.D.Pa.1965). However, in the *Lindy* case, cited *supra*, the Court of Appeals for the Third Circuit declared that the starting point for fixing reasonable attorney fees was the hours spent and the petitioning attorney's normal billing rate, and that the burden of showing both of these amounts was on the attorney(s) seeking the award. It is true that *Lindy* involved an award to be paid to plaintiff's attorneys from a fund received by plaintiff in settlement of an anti-trust case as compensation for services rendered a particular class of plaintiffs, whereas in the present case attorney fees are not being sought on a quantum meruit basis for services rendered to the plaintiff class. But we still feel that *Lindy* sets down the only rational basis for arriving at reasonable attorney fees in the Section 4 situation. Even if *Lindy* had never been written, we would have followed a process similar to the one it outlines.

*Lindy* does not, of course, state that only total hours, and the amount plaintiff's attorney normally charges for

those hours, should be considered by a court in awarding attorney fees. The award is to be adjusted (in either direction) depending on the degree of contingency in plaintiffs' success and the quality of their attorneys' work. Among the factors to be considered in judging the latter are "the complexity and novelty of the issues presented, the quality of the work that the judge has been able to observe, and the amount of the recovery obtained." 487 F.2d at 168.

Plaintiffs' counsel have submitted the total number of hours spent on this case by all members of their firm who worked on it. They have broken this total down into the number of hours devoted by each attorney, and have included the normal hourly rate charged by each of these attorneys. The total number of hours claimed by plaintiffs' attorneys is 3,270.9 [17]; if these hours were to be compensated at these attorneys' normal billing rate, the plaintiffs would be owed $252,385.00.

Defendant disputes plaintiffs' figures as to the number of hours spent on this case. The main thrust of their attack centers upon the time spent immediately before and at trial by Messrs. Rabin and Baruch. Two Thousand Two (2,002) hours, or 59% of the total number of hours plaintiffs' counsel charged to the case were accounted for by five time slips which were prepared by counsel after the trial on the basis of their recollection. These time slips show that lead counsel for plaintiffs estimated that they worked 11 hours for 6 days a week, or 66 hours a week during the pretrial period (7 weeks) and 15 hours a day for 7 days a week, or 105 hours a week during the trial period (approx. 6 weeks). Defendant contends that counsels' maintaining such a schedule over the stated period of time is unlikely, and advances in support of its contention the register book of the building in which the law firm of Messrs. Rabin and Baruch is lo-

cated. Entries in this register do not substantiate plaintiffs' attorneys' claims; they show that the attorneys were not checked in at times they have claimed they were working. Defendant also asserts that the fact that time slips for the pretrial and trial periods were not made contemporaneously renders them of little value.

While the register book seems to undercut the picture of a seven day a week, fifteen hour a day routine, we do not feel that we could begin subtracting hours from the total without litigating the register's reliability. This would be collateral to the issue before us, which is to determine a basis upon which reasonable attorney fees can be computed. We will accept plaintiffs' representations rather than involve the Court in the minutiae of plaintiffs' attorneys' method of operation. Likewise, while contemporaneous, detailed time sheets would be the best evidence, we will accept plaintiffs' attorneys' time slips for the pretrial and trial periods. The *Lindy* case was decided after most of these hours had been put in, and it would be unfair to punish these attorneys for not making the kind of records they had no reason to know they would need. Perhaps it needs no mention that future plaintiffs' counsel would be wise to keep contemporaneous time records.

Defendant's second and critical attack on plaintiffs' hours figure is grounded on plaintiffs' failure to separate the hours spent on their anti-trust claim from those spent on their contract and Dealers' Day in Court Act claims. Section 4 of the Clayton Act allows recovery of attorney fees for successful prosecution of the anti-trust claim, but there is no concept of "pendancy" which would gain plaintiffs an award for these other claims (neither of which was successful). Plaintiffs have made a small deduction for legal research spent on these two claims [18] but claim that all

---

17. Plaintiffs originally claimed to have put in 3,413.6 hours, but reduced this figure by

142.7 hours allegedly spent developing claims other than the anti-trust claim.

18. See Footnote 17, *supra.*

hours spent developing these claims at or before trial are properly chargeable to the anti-trust claim. Defendant disputes this to the point of preparing a page-by-page analysis of each document involved in the case, including the transcript, in an attempt to ascertain the proportion of the hours claimed attributable to the anti-trust claim.

Plaintiffs' argument for attributing nearly all the hours they worked to the anti-trust claim is that this claim would have been unintelligible to the jury unless all the background and consequential facts, including those that gave rise to the contract and Dealers' Day in Court Act claims, were presented. Defendant's page by page analysis attributes only 52% of plaintiffs' case to proving the anti-trust claim. (This figure would be approximately 60% if hours related to damages from the loss of Chestnut Motors were allowed). Thus the relevancy of almost half of the hours claimed by plaintiffs' attorneys is in dispute.

We are unwilling to either accept defendant's characterizations at face value, because of the questions of judgment and perspective involved, or to review every page involved in this case to make our own distinctions. Therefore, we will make our own distinctions based on a witness by witness rather than a page by page approach. Based on our perception of the witnesses' testimony at trial, we believe the testimony of Messrs. Rosenfeld, Pryor, Oswald, Brantz, and Clouser was less closely related to the anti-trust claim than it was to plaintiffs' other two claims. While it could

be expected that these witnesses would have been deposed and called at trial in connection with the anti-trust claim, we feel justified in restricting plaintiffs' attorney fees to one-half of the time and energy spent deposing these witnesses or examining them at trial. While this method may be less exact than that proffered by defendant, we believe that it is as just in the long run as well as constituting a simpler and more expedient approach to the problem of fixing reasonable attorney fees.

According to the pages of testimony and depositions allocated to these witnesses by the defendant, the exclusions made represent 476 pages out of a total of 6,945, or approximately one-fourteenth of the total.[19] An equivalent reduction in the amount normally charged by plaintiffs for their time would be $18,028. $(\frac{\$252,385}{14})$ [20] This would leave the total hours charged at plaintiffs' attorneys' normal billing rate at $234,357.

 This analysis includes in plaintiffs' compensable hours the time spent on developing damages for plaintiffs' loss of Chestnut Motors. Defendant asserts that such time should not be included because the Court did not ultimately allow proof of such losses as part of the anti-trust claim. It is our opinion that, where evidence of these losses to show comparative losses at Presidential was not excluded until the middle of trial, and where evidence of such losses as the proximate result of the claimed anti-trust violation was not disallowed

19. The breakdown of pages by witness is as follows:

| Trial Testimony | | Depositions | |
|---|---|---|---|
| Rosenfeld | 42 | Pryor | 77 |
| Pryor | 247 | Oswald | 37 |
| Oswald | 76 | Brantz | 23 |
| Brantz | 57 | Clouser | 170 |
| Clouser | 222 | Total | 307 |
| Total | 644 | | |

20. Of course, this arithmetic assumes that the billing rate spent on developing these witnesses' testimony was the average for all the work done.

until the end of trial, any exclusion of the house spent developing this evidence would be unfair. There was a reasonable basis for urging the consideration of damages from the loss of Chestnut as part of plaintiffs' anti-trust claim. TWA v. Hughes, S.D.N.Y., 312 F.Supp. 478, 483, aff'd, 2 Cir., 449 F.2d 51; reversed on other grounds, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973).

 To the amount reached above must be added an amount representative of the quality of plaintiffs' attorneys' work and the contingent nature of their success. This case was a long and complicated one, for which no groundwork was laid by a prior government indictment. Plaintiffs' counsel, faced with able and articulate counsel on the other side, succeeded in convincing the jury of the merit of their claim. We find that the sum of $150,000 will adequately compensate plaintiffs for the quality of their attorneys' work and the contingent nature of their success. The total award of attorney fees is, therefore, $384,357.00.

### Dealer's Day in Court Act Claim

Plaintiffs have moved for a new trial, limited to the issue of damages, of their Dealers' Day in Court Act claim if and only if this Court grants defendant's motion for judgment n. o. v. on their anti-trust claim. Since the Court has denied defendant's motion of judgment n. o. v. on the anti-trust claim, plaintiffs' motion for a new trial will be denied. Similarly, defendant has moved for a new trial as to liability on the Dealers' Day in Court Act claim should plaintiffs be awarded a new trial as to damages. Since plaintiffs' new trial motion has been denied, defendant's will be also.

### Breach of Contract Claim

#### I. *Plaintiffs' Motion for an Amended Judgment*

 Plaintiffs request under Federal Rule of Civil Procedure 59(e), that we amend our entry of judgment [21] in favor of defendant on the breach of contract claim and instead enter judgment in favor of plaintiffs on this claim in the sum of $1,250,000, which the jury found to be the extent of plaintiffs' damages from the breach.

In their arguments in support of this motion, plaintiffs neglect to mention the Statute of Frauds which the Court was enforcing in entering judgment in favor of defendant. Although in its answer to interrogatory No. 16 the jury found that Ford had entered into a contract with plaintiffs for the sale of Presidential, this contract was unenforceable because its subject matter included goods worth more than $500 and a lease in excess of three years and was unsigned by Ford. 12A P.S. § 2–105 (1970) (U.C.C. provision relating to goods); 68 P.S. §§ 250.-201–250.203 (1965) (provision relating to leases).

However, this Court was inclined to follow the reasoning of the Pennsylvania courts that the Statute of Frauds should not be permitted to immunize fraudulent conduct.[22] Accordingly, the Court submitted to the jury the questions of whether defendant's agents had a duty under the circumstances to disclose certain facts to plaintiffs and whether they intentionally failed to perform this duty (interrogatories Nos. 14 and 15). The jury found that defendant's agents had not intentionally misled plaintiffs. Absent a finding of wilful misconduct, we could see no reason why the Statute of Frauds should not be enforced here.

Plaintiffs now argue that, although they knew it was an offer to purchase and not a contract they were signing on

21. As stated before, this Court's entry of judgment in favor of defendant more closely resembled the "moulding" of the verdict than it did judgment n. o. v. See FN. 3, *supra*.

22. See footnote 6, *supra*.

474

December 18, 1969, defendant's agents induced plaintiffs into believing that Leaseco's approval would constitute Ford's acceptance and that no further formal procedures were necessary to make the contract binding. However, no mention was made at trial, nor in any of plaintiffs' trial memoranda concerning the application of the Statute of Frauds, of any misrepresentations, intentional or otherwise, concerning the manner in which Ford would accept plaintiffs' offer to purchase Presidential. The jury found a contract was entered into on December 18, 1969, conditioned only upon acceptance by Leaseco of the deferred rent plan, and plaintiffs cannot argue that the jury's answers support a theory of fraud which presumes that only an offer was made at that time.

## II. *Defendant's Motion for a New Trial*

Defendant has moved for a new trial on the breach of contract claim should we decide to vacate judgment in its favor. Since we have not done so, defendant's new trial motion will be denied.

See also D.C., 361 F.Supp. 1351, 378 F.Supp. 481.