**TOWER TIRE AND AUTO CENTER,
INCORPORATED, Plaintiff,**

v.

**ATLANTIC RICHFIELD COMPANY
et al., Defendants.**

**Civ. A. No. 72–H–879.**

United States District Court,
S. D. Texas,
Houston Division.

April 10, 1975.

Roger R. Wright, Jr., of Woodard, Hall, McCrory, Henry & Primm, Houston, Tex., for plaintiff.

W. Randolph Elliott, of Wynne, Jaffe & Tinsley, Dallas, Tex., for defendant Atlantic Richfield Co.

William E. Junell, Jr., of Reynolds, White, Allen & Cook, Houston, Tex., for defendants Houston Tire & Automotive Co., B. K. LaRue, Kyle Read and Luther F. Allen.

## MEMORANDUM OPINION

NOEL, District Judge.

### I. PREFACE

Plaintiff Tower Tire and Auto Center, Inc. (hereinafter called Tower Tire), whose precursor was Greater Houston Tire Company (hereinafter called Greater Houston or the old franchise), brought this action in July, 1972. The defendants originally named were Atlantic Richfield Company (hereinafter called Arco), Continental Oil Company (hereinafter called Conoco), Houston Tire and Automotive Company (hereinafter called Houston Tire or the new franchise), B. K. LaRue, Kyle Read and Luther F. Allen.[1] Defendants LaRue, Read and Allen were employees of defendant Houston Tire when this action was brought and these four will be collectively referred to as the Houston Tire defendants.

Plaintiff's original complaint alleged various violations of the Sherman and Clayton Antitrust Acts, 15 U.S.C. § 1 et seq. The bare outlines of the factual side of the complaint follow:[2]

Beginning in 1969, Greater Houston engaged in the wholesale distribution of tires, batteries and accessories (hereinafter called TBA) in the Houston area with a franchise from defendant Arco. Until late 1970 or early 1971, Greater Houston was managed by defendant Allen. Defendants LaRue and Read were Supervisor and Manager, respectively, of retail sales of petroleum products for defendant Arco in Houston.

Commencing in late 1970, the positions of the parties underwent considerable flux. Allen ceased to function as manager for Greater Houston. Read and LaRue were assigned to different positions with Arco outside Houston. In January, 1971, LaRue resigned his position with Arco and became owner, president and manager of a new Arco franchise, Houston Tire, which distributed, inter alia, TBA at wholesale in Houston. In March and April, 1971, Allen and Read joined LaRue at Houston Tire. These facts seem undisputed.

Plaintiff Tower Tire would add to these facts. Plaintiff asserts that the name which defendants gave the new franchise was deliberately chosen to be deceptively similar to plaintiff's; that the defendants conspired to hire away plaintiff's key employees; that the defendants agreed to use their "inside" positions with Greater Houston to divert customers to the new franchise; and, that defendant Arco in particular used discriminatory business practices to favor the new over the old franchise as a part of the same agreement or conspiracy.

In its original answer, defendant Arco asserted a counterclaim based on alleged debts, which plaintiff has answered. By April 15, 1974, much discovery had been completed, plaintiff's complaint had been amended to include a claim under the Texas Antitrust Act, Tex.Bus. & Com. Code § 15.01 et seq., V.T.C.A., and motions for summary judgment had been filed by the defendants. On that date oral argument was heard on these motions. Thereupon, an order of dismissal was entered eliminating all of plaintiff's claims for relief except that based on Section 1 of the Sherman Act, 15 U.S.C. § 1.[3]

---

1. By a Suggestion of Death filed on November 1, 1974 the Court learned of the death of defendant Allen during the pendency of this action.

2. The factual summary in the text omits all reference to defendant Conoco. Conoco counterclaimed against Tower Tire and added two counterclaim defendants, B. R. McNulty and Jack Edwin Saunders, who now manage plaintiff's business. The entire controversy between these four parties was severed from this civil action in April, 1974 and all claims therein were dismissed.

3. In pertinent part, 15 U.S.C. § 1 provides:
 Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: . . . .

## II. THE PRESENT STATUS OF THE CASE

Plaintiff's complaint under Section 1 is grounded in a line of cases originating with Albert Pick-Barth Co. v. Mitchell Woodbury Corp., 57 F.2d 96 (1st Cir.), cert. denied 286 U.S. 552, 52 S.Ct. 503, 76 L.Ed. 1288 (1932). The *Pick-Barth* case first established that conspiring to use unfair trade practices to destroy a competitor's business constituted a *per se* violation of Section 1. The line of cases applying this principle was, until recently, an exceedingly thin one. Even now, it would appear that only a handful of courts[4] have been called upon to apply the *Pick-Barth* rule. The Supreme Court has never considered it.

Plaintiff was directed to identify the witnesses it intended to rely upon at trial to establish such a violation of Section 1. This was done and all defendants renewed their motions for summary judgment on the basis of the case plaintiff offered to prove.

 In moving for summary judgment, defendants call upon the Court to conclude that there is no genuine issue as to any material fact, and that defendants are entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). All pleadings must be construed liberally in favor of the party against whom the motion is made. Dassinger v. South Central Bell Tel. Co., 505 F.2d 672, 674 (5th Cir. 1974). "The burden is on the moving party to show that there is not the slightest doubt as to the facts and that only the legal conclusion remains to be resolved." Ins. Co. of North America v. Bosworth Constr. Co., 469 F.2d 1266, 1268 (5th Cir. 1972). The Court is "not called upon to decide factual issues, but only to determine whether there may be factual issues to be tried." McPhee v. Oliver Tyrone Corp., 489 F.2d 718, 720 (5th Cir. 1974). And, of course, there will always be factual issues to be tried when the law provides that, at least under some facts which may be proved, the opposing party shall prevail.

This case is in a peculiar posture. The weaknesses of plaintiff's allegations led this Court, as noted above, to require plaintiff to identify those witnesses who could be called upon to give evidence in support of plaintiff's one remaining claim. In effect, plaintiff was asked to make an offer of proof.

In their memoranda in support of their renewed motions, defendants analyze the available testimony of the named witnesses as found in their depositions. They invite this Court to conclude that all the proof available to plaintiff, even if completely accepted by the Court, would not sustain any one of the elements of plaintiff's claim under Section 1 of the Sherman Act.

Originally, there was no dispute between the parties over the essential elements plaintiff must prove to established a *per se* violation of Section 1 under *Pick-Barth,* supra.[5] All concurred that in order to recover plaintiff must show:

1) that there existed an agreement, combination or conspiracy between the defendants;

2) that unfair methods of competition were employed as a part of the agreement, combination or conspiracy; and

---

Section 4 of the Clayton Act, 15 U.S.C. § 15 provides:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

4. Cf. the discussion in the text, Part III, infra, and Note, Unfair Competition under the Sherman Act: C. Albert Sauter Co. v. Richard S. Sauter Co. and the Pick-Barth Rule, 59 Iowa L.Rev. 1194 (1974) (hereinafter called Note, Unfair Competition).

5. But see Part VI, infra.

3) that the intent of the parties to the agreement, combination or conspiracy was to injure or destroy plaintiff as a competitor.

On December 12, 1974, this Court issued a Minute Entry which addressed defendants' motion for summary judgment. To summarize briefly, this Minute Entry reviewed the evidence plaintiff offered and stated the following conclusions:

(a) defendants' motions could not be granted in reliance on an absence of proof of the existence of an agreement, combination or conspiracy between the defendants; and

(b) defendants' motions could not be granted on the basis that there was no proof of the use of unfair trade practices.

The aforementioned Minute Entry went on to call for additional memoranda from the parties on the third element of plaintiff's cause of action—the requisite intent. The Minute Entry outlined some confusing problems surrounding the intent element. The parties have now responded to the Minute Entry and the motions of the defendants are ripe for disposition. As will appear, defendants' motions must be denied.

As indicated in the statement of uncontested facts above, this case involves the establishment of a new franchise to distribute TBA at wholesale in the Houston area. On its face, the establishment of the new franchise increased competition. Plaintiff is in the position of having to argue that this seemingly competitive act was, in fact, anti-competitive. Further, plaintiff must show, to invoke the *per se* rule of *Pick-Barth*, that the conduct complained of was so inherently anticompetitive that our courts must not listen to arguments based on reasonableness.

*Pick-Barth* and its progeny have held that the *per se* rule shall only be applied when it can be shown that the defendants (and, perchance, those acting in concert with them) have *conspired with the intent of effectively eliminating* the business against which they entered into competition. A brief review of the cases in point will be useful in explaining the nature of the intent which must be shown.

## III. PRECEDENTS ON REQUISITE INTENT

### A) *Pick-Barth*

In Albert Pick-Barth Co. v. Mitchell Woodbury Corp., supra, the Court of Appeals for the First Circuit established the rule plaintiff here seeks to invoke. In *Pick-Barth* two individual defendants, employees of plaintiff, were shown to have conspired with the corporate defendant to establish a competing kitchen equipment business. This endeavor was furthered when the defendants pirated plaintiff's customer lists and business data, hired away other employees of plaintiff, and used their positions with plaintiff to solicit plaintiff's customers for the new business. Thus, the facts were strikingly similar to those here alleged.

The District Court allowed and the Court of Appeals affirmed an award of treble damages under Section 1 of the Sherman Act. The appellate opinion in *Pick-Barth* focused on the proven intent of the conspiracy—"to acquire the plaintiff's business . . . and to *eliminate* the plaintiff as a competitor." 57 F.2d at 101 (emphasis supplied). The Court of Appeals explicitly rejected a defense based on an absence of public injury [6] saying:

To constitute an offense under section 1 of the Sherman Act, it is not necessary, if a conspiracy is proven, the purpose and intent of which was to

---

[6] This element was not present presumably because "the plaintiff after a time succeeded in re-establishing an organization in its kitchen equipment department." *Pick-Barth, supra, 57 F.2d at 101–02.*

eliminate by unfair means a competitor in interstate trade, to show that the public was affected, and to what extent.

*Pick-Barth,* supra, 57 F.2d at 102. With these words a new *per se* violation was identified.

### B) *Atlantic Heel*

For twenty-eight years, the principles of *Pick-Barth* apparently went unnoticed. But the Court of Appeals for the same Circuit met a similar case in 1960: Atlantic Heel Co. v. Allied Heel Co., 284 F.2d 879 (1st Cir. 1960). The complaint, which had been dismissed by the District Court for failure to state a claim, outlined a conspiracy to establish a new competing enterprise and to eliminate the plaintiff by the use of unfair trade practices. The unfair practices alleged included the hiring of key employees of the plaintiff, the theft of trade secrets, the dissemination of false information regarding plaintiff, and the breach of certain fiduciary duties.

The Court of Appeals held that the complaint did state a claim under *Pick-Barth.* In *Atlantic Heel,* the court expounded upon the *per se* character of the antitrust violation alleged and concluded that,

> . . . the purpose of *destroying* a competitor by means that are not within the area of fair and honest competition is a purpose that clearly subverts the goal of the Sherman Act. It constitutes an interference with the natural flow of interstate commerce which would exist under conditions of fair and honest rivalry for the buyer's trade.

*Atlantic Heel,* supra, 284 F.2d at 884 (emphasis supplied).

### C) *Perryton*

In Perryton Wholesale, Inc. v. Pioneer Distributing Co., 353 F.2d 618 (10th Cir. 1965), cert. denied, 383 U.S. 945, 86 S.Ct. 1202, 16 L.Ed.2d 208 (1966), the principles of *Pick-Barth* were applied by the Court of Appeals for the Tenth Circuit. In *Perryton* a new entrant to the business of "rack jobbing" [7] conspired with a former employee of an established competitor, Pioneer, to hire away Pioneer's salesmen and to divert Pioneer's customers to the new business. The District Court allowed treble damages under Sections 1 and 15 of the Sherman Act.

In countering Perryton's defense that a "breach of the conventional standards of fairness and morality is not enough standing alone" to constitute an antitrust violation, the Court of Appeals held:

> The statute applies when there is a conspiracy to impose an unreasonable restraint on interstate trade and commerce. This occurs when a conspiracy exists to suppress competition in interstate trade through the *elimination* of a competitor by unfair means.

*Perryton,* supra, 353 F.2d at 621 (emphasis supplied). The Court went on to explain:

> In the case at bar the intent of the conspiracy was to *eliminate* the competitor predominant in the area by the subversion of its employees. Such *elimination* destroys rather than maintains competition, is an unreasonable restraint on trade, and violates the statute.

Id at 622 (emphasis supplied).

### D) *Vogue Instrument* and *Northeast Airlines*

In 1966 two district courts had occasion to consider the *Pick-Barth* rule. In Vogue Instrument Corp. v. Lem Instruments Corp., 40 F.R.D. 497 (S.D.N.Y. 1966), former employees of a division of plaintiff were charged with abusing their positions in a variety of ways to further the success of a new competitor

---

7. The trade of a rack jobber is described in *Perryton,* supra, 353 F.2d at 620. Basically, a rack jobber supplies retail outlets such as grocery stores with various non-food items which are displayed by the retailer on racks.

founded by them. The plaintiff based its complaint on Section 1. The District Court observed that "the case scarcely conveys to 'the expert feel of lawyers' . . . a sense of striking, or even familiar, Sherman Act implications." *Vogue Instrument,* supra, 40 F.R.D. at 499. The opinion goes on to acknowledge the support plaintiff drew from *Pick-Barth, Atlantic Heel,* and *Perryton* and concludes that a summary judgment could not be granted for the defendants until the "full and concrete detail of a trial record" was available to aid in the application of the proper rule of law.

In Northeast Airlines, Inc. v. World Airways, Inc., 262 F.Supp. 316 (D. Mass.1966) two defendants counterclaimed asserting that Northeast made false statements about its competitor, particularly to the Civil Aeronautics Board, instituted baseless litigation and induced customers to breach agreements with the competitor. A motion to dismiss was rejected, principally in reliance on *Atlantic Heel.*

Neither of these decisions at the trial level reveal a great deal about the nature of the intent which must be shown to bring a case within the *Pick-Barth* line. In all likelihood, this was a result of the posture in which the cases were considered—both opinions having been rulings on pretrial motions. Thus, although they yield little learning on the intent issue, these cases do highlight the wisdom of a cautious forbearance in judging motions to dismiss or summarily judge a complaint of this genre.

## E) *Metal Lubricants*

In Metal Lubricants Co. v. Engineered Lubricants Co., 411 F.2d 426 (8th Cir. 1969), the Court of Appeals for the Eighth Circuit faced a case wherein the plaintiffs relied on the *Pick-Barth* rule. When the defendant company was established by old employees of the plaintiff, a complaint was filed alleging enticement of plaintiff's key employees and salesmen, misappropriation of trade secrets, and disparagement of plaintiff's product and financial condition. "[T]he trial court found on the evidence submitted that there existed no conspiracy to *eliminate* plaintiff unfairly from competition . . . ." *Metal Lubricants,* supra, 411 F.2d at 431 (emphasis supplied).[8] The gist of the Court of Appeals' ruling was to affirm the trial court's decision that the plaintiff had failed to prove its case. No doubt as to the applicable rule of law was expressed.

## F) *Harrison*

Harrison v. Prather, 435 F.2d 1168 (5th Cir. 1970), cert. denied, 404 U.S. 829, 92 S.Ct. 67, 30 L.Ed.2d 58 (1972), is apparently the only case in this Circuit which is even arguably similar to those discussed above. The Sherman Act complaint in *Harrison* was supported by a special verdict which found that the defendant maliciously interfered with the granting of a loan to the plaintiff and that the conspiracy to so interfere was in restraint of interstate trade. Despite the marked factual dissimilarity between his case and any case, including *Pick-Barth* and its progeny, establishing *per se* violations of the antitrust laws, the plaintiff sought treble damages. The Court of Appeals held that the defendant's conduct had no "monopolistic tendency" and affirmed the trial court's refusal to allow treble damages. *Harrison,* supra, 435 F.2d at 1176.

Superficially, *Harrison* can be interpreted as a case which denies that a con-

---

8. The District Court had said :
 To hold that the defendants' tacit agreement that they might go into business in competition with plaintiff was a conspiracy in restraint of trade, much less one constituting an unreasonable restraint, would be to go far beyond [*Pick-Barth, Atlantic Heel* and *Perryton*]. The court thinks that competition was not lessened,

and was probably fostered by defendants' move, although certainly plaintiff's business has suffered, and it, therefore, concludes that the Sherman Act authorizes no injunctive relief on the facts shown.
Metal Lubricants Co. v. Engineered Lubricants Co., 284 F.Supp. 483, 490 (E.D.Mo. 1968).

spiracy to employ unfair competitive practices in restraint of trade constitutes an antitrust violation.[9] But two factors mitigate against a broad application of *Harrison* to the instant case:

1) *Harrison* had no meaningful factual resemblance to the *Pick-Barth* cases, and

2) there was no showing that the conspiracy made out had as its purpose the *elimination* of the plaintiff from the business in which the proceeds from the loan were to be used.

### G) *Chusid, Sauter,* and *Walston*

After almost forty years, there were only three cases—*Pick-Barth, Atlantic Heel* and *Perryton*—which provided effective guidance in the construction of the *per se* rule as it might apply to the instant case. In comparatively rapid succession, however, three different District Courts were confronted with the problem.

Frederick Chusid & Co. v. Marshall Leeman & Co., 326 F.Supp. 1043 (S.D. N.Y.1971) was in sharp contrast to the District Court decisions discussed in Section D, above. *Chusid* was not only rendered after a full trial; it also spoke emphatically on the issue of requisite intent. The alleged facts fit the familiar mold. Plaintiff's former employees conspired to establish the defendant executive counseling service directly in competition with plaintiff, other employees of plaintiff were induced to switch allegiances, fraudulent representations were employed to plaintiff's detriment, and trade secrets were dishonestly acquired and used.

The antitrust claim based on these allegations was dismissed. The Court quoted language from *Pick-Barth, Atlantic Heel* and *Perryton* which emphasized the reliance in those cases on the defendants' intent to eliminate or de-

stroy the complaining competitor. The opinion in *Chusid* concludes:

. . . . In all of the cited cases, an essential and emphasized element of the antitrust offense was that the conspiracy to solicit employees had the purpose or effect or both, of *eliminating* the plaintiff from competition. . . . The case at bar is different because the purpose and effect of the conspiracy here was not to eliminate Chusid as a competitor, but to establish Leeman, by unfair means, as a competitor. As far as the antitrust laws are concerned, competition has been increased because there is one more effective competitor. The evidence shows that there was never any danger that Chusid would be *eliminated* from competition and it was not the purpose of defendants to do so; they wanted merely to secure for themselves more money from the expanding market in which Chusid operated; their endeavors caused Chusid to be hurt but only lightly.

*Chusid*, supra, 326 F.Supp. at 1063 (emphasis supplied).

C. Albert Sauter Co. v. Richard S. Sauter Co., 368 F.Supp. 501 (E.D.Pa. 1973) appeal dism., No. 73–2003 (3d Cir. Apr. 4, 1974), arguably contradicted *Chusid*. Again the facts were remarkably similar to those seen before. Plaintiff, an established pharmaceutical packaging concern, complained that a new business with a deceptively similar name was created by plaintiff's former employees who hired away key personnel, acquired confidential information, and induced plaintiff's employees to breach their fiduciary duties.

The Court's discussion of the governing legal principles repeatedly makes reference to the defendant's intent to "injure" plaintiff's business.[10] A review of the leading cases ended with the conclusion that

---

9. See Note, Unfair Competition, supra, at 1206.

10. *Sauter*, supra, 368 F.Supp. at 512–14.

[w]henever a plaintiff can prove by a preponderance of the evidence that defendant conspired, agreed or had an understanding to engage in acts of unfair competition with the intent to *injure* the plaintiff as a competitor by impairing plaintiff's ability to compete in interstate commerce, then defendant has violated Section 1 of the Sherman Act.

*Sauter,* supra, 368 F.Supp. at 513 (emphasis supplied).

However, it is not clear that the opinion in *Sauter* was intended to affect the degree of intent which must be shown. The summary of the facts in *Sauter* which introduces the opinion repeatedly refers to the defendant's intention to eliminate, cripple, or ruin plaintiff's business.[11] The confusion thus generated was only compounded when the *Sauter* Court misstated the holding in *Chusid* with these words:

In Chusid, the Court held that a conspiracy to establish a competitor by means of unfair competition was not a violation of the Sherman Act since it found that there was no intent to *injure* the competitor.

Id at 514 (emphasis supplied). As indicated above, the *Chusid* Court went to great lengths to specify that an intent to merely injure a competitor is insufficient; that the requisite intent is one to eliminate or destroy the competitor.

duPont Walston, Inc. v. E. F. Hutton & Co., 368 F.Supp. 306 (S.D.Fla.1973) was a dispute growing out of the reduction of branch office operations of a stock brokerage. To plaintiff's apparent surprise, a key employee supervising the realignment of plaintiff's operations left for the defendant competitor and, with defendant's help, took a substantial number of plaintiff's other employees with him. Certain business records were temporarily removed by these employees as they departed.

A *Pick-Barth* antitrust complaint based on these alleged facts was dismissed. In comparison with previous cases, *Walston* is manifestly weak on the facts. Not surprisingly, the Court concluded that the "alleged conspiracy [did] not rise to the level of a *per se* violation of Section 1 of the Sherman Act." *Walston,* supra, 368 F.Supp. at 309. The heart of the opinion was the Court's finding that no public injury could possibly have occurred. The controversy was found to be strictly private in nature. *Id.*

## IV. SUMMARY OF REQUISITE INTENT

Of the foregoing cases, only five are of any real assistance in defining the intent which must be shown to invoke the *Pick-Barth* rule. The three earliest decisions, *Pick-Barth, Atlantic Heel* and *Perryton,* all from Courts of Appeals, speak of an intent to eliminate or destroy a competitor without discussing the issue at length. *Chusid,* on the other hand, did address this question specifically and forcefully held that the intent must be one to eliminate the established competitor. *Sauter* seemed to consider that an intent to injure the competitor would suffice, but the opinion is ambiguous. Thus, the only conclusion sup-

---

11. The following illustrative statements have been selected from the factual summary in *Sauter*:

There was sufficient evidence from which the jury could find that the defendants solicited, hired or frightened away plaintiff's key employees for the purpose of *eliminating* plaintiff as a competitor.

*Sauter,* supra, 368 F.Supp. at 506 (emphasis supplied);

Plaintiff produced direct evidence of defendants' intent to *eliminate* or *cripple* plaintiff's business.

Ibid (emphasis supplied);

Starting with the stated intention to *ruin* [the president of plaintiff's parent corporation], the testimony, when viewed in a light most favorable to the plaintiff, supports the jury's finding of an intent to injure the plaintiff as a competitor by impairing plaintiff's ability to compete in interstate commerce.

Id at 507 (emphasis supplied).

ported by the force of precedent is that the requisite intent must be that of eliminating the competitor, as opposed to merely injuring the competitor.

 This conclusion is also supported by the force of reason. The Sherman Act was never intended to be a national prohibition against unfair methods of competition. Our antitrust laws are aimed at protecting competition, not competitors. Competition will ordinarily be enhanced, not threatened, by the entry of a new competitor into the marketplace. It is only when the new entrant strives for success by seriously undermining the ability of others to compete that the antitrust laws can fairly be looked to for relief.

Of course, it would seem unusual to find evidence of a conspiracy to use unfair trade practices which was marked by a specific intent to so injure a competitor that the competitor would be completely driven from the marketplace, i. e., forced to abandon the area of commerce in question. Perhaps in some of the decided cases such an intent was found. Perhaps such an intent could be proven by plaintiff Tower Tire in the instant case. But to require such proof would certainly be to read the *Pick-Barth* rule restrictively.

The foregoing represent the tentative conclusions this Court had reached on the issue of requisite intent before learning of the decision of the Court of Appeals for the First Circuit on December 17, 1974 in George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 508 F.2d 547 (1st Cir. 1974) initially reported in 1974–2 Trade Cas. ¶ 75,434 at p. 98,404.

## V. THE WHITTEN DECISION

In *Whitten,* the Court of Appeals which gave birth to the *Pick-Barth* rule was called upon to apply it once again. Plaintiff Whitten had complained of several associated companies competing

with Whitten in the business of manufacturing and merchandising prefabricated metal recirculation systems for swimming pools. The defendants, Whitten claimed, had attempted to gain competitive advantages by a variety of unfair means including the use of false representations, threats of litigation, and "sharp" or corrupt efforts to influence architects, engineers, public officials and others who controlled buying in the relevant market. Because this Court finds the *Whitten* decision to be of great importance to the instant case, its treatment of the Section 1 claim will be extensively discussed.

The first problem with the plaintiffs' claim found by the Court of Appeals was the failure of the plaintiff to convince the trial court that much of what had been done amounted to unfair trade practices. But the plaintiff's failure had not been so complete as to preclude appellate consideration of the Section 1 claim.[12]

The second problem identified in *Whitten* was the broad one of fitting the complained-of acts into a mold cut by better known *per se* violations. The Court discussed practices such as price fixing, group refusals to deal and market allocations which are *per se* illegal under the Sherman Act, i. e., which receive no assessment of their actual effect under the "rule of reason" though they may be subject to some inquiry relevant to market power. These practices are of a different cast than the conduct of which the defendant Paddock stood accused. *Whitten,* supra, 508 F.2d at 559.

Nevertheless, the Court of Appeals was "not willing to say that the Sherman Act is not applicable to the range of unfair competitive methods evidenced here." The Court did find at least three reasons for exercising great care in defining the *per se* rule the plaintiff relied

---

12. In particular, the efforts to influence various people with control over buyers in the relevant market were found to be unethical, though largely ineffective. *Whitten,* supra, 508 F.2d at 558–59.

on. First, the Court noted that "[t]he nexus between the [alleged conduct of the defendant] and a tendency to monopoly is not so close and likely that the certainty of a clear and absolute standard is preferred to a case-by-case analysis." Second, the Court expressed concern over "judicial crime making", i. e., "elevating to a federal crime what has previously been attacked on the basis of a state law or civil penalty." Third, the Court manifested concern over creating a "federal common law of unfair competition." *Whitten,* supra, 508 F.2d at 560.

It was in this context that the *Whitten* Court emphasized that the strongest authorities in support of the plaintiff's case were its own decisions in *Pick-Barth* and *Atlantic Heel.* Admitting its previous "failure to define with any precision the practices held to be a per se violation", the Court concluded:

> Insofar as *Pick-Barth* and *Atlantic Heel* may be said to stand for the broad proposition that unfair competitive practices accompanied by an intent to hurt a competitor constitute per se violations of the antitrust laws, we do not now accept their teaching. We do not feel it necessary to criticize their results on the fact situations there presented—an effort by a defendant which was a significant factor in the market to eliminate a competitor. . . . In the instant case the focus is not on crippling the organization of a competitor but on beating it in the market place. . . . But we cannot say that such attempts, even though unfair and reprehensible, amount to a per se violation of the antitrust laws.

*Whitten,* supra, 508 F.2d 561–62. Having removed the case from the *per se* category, the *Whitten* Court succinctly found that there had been no evidence to support a finding of "harm to general competition in the market" under the rule of reason. *Whitten,* supra, 508 F. 2d at 562. The decision of the District Court denying relief was affirmed.

## VI. CONCLUSION ON REQUISITE INTENT

*Whitten* could be interpreted as merely declining to apply the *Pick-Barth* rule where there was no evidence that the defendants attempted to "crippl[e] the organization of a [complaining] competitor". *Whitten,* supra, 508 F.2d at 562. This interpretation would effectively distinguish *Whitten* from the instant case. But such an analysis would ignore much of the language in *Whitten* which, be it dicta or not, is most persuasive.

Accordingly, this Court will follow the lead of the Court of Appeals for the First Circuit. The *Pick-Barth* rule must henceforth be applied with great circumspection. It will not suffice for plaintiff Tower Tire to show that the defendants agreed merely to harm plaintiff's business. Nor will it suffice for plaintiff to show that the alleged conspiracy was "calculated to cause a substantial decline in the ability of [the] existing competitor to compete" as plaintiff has urged.[13] To succeed in its alleged cause of action, plaintiff must obtain a fact finding that the intent of the defendants was effectively to eliminate plaintiff from the relevant market.[14] This, plaintiff is apparently ready to undertake.[15]

> The Court notes that the relative success of the conspiracy, if any be proven, among the defendants will be directly relevant to damages only. The actual success or failure of the alleged conspirators will have only an indirect relation to their intent.

13. See Plaintiff's Supplemental Memorandum of Authorities, page 4 (filed Jan. 2, 1975).

14. The parties are apparently in agreement that the relevant market is the wholesale distribution of tires, batteries, and accessories in the Houston metropolitan area. Whether the parties have reached an acceptable agreement on this score sufficient to permit the case to proceed to trial may have to be resolved through pretrial conferences.

15. Plaintiff's memorandum filed March 5, 1974 opens with these words:
 Plaintiff has alleged that the Defendants conspired against it . . . to eliminate Plaintiff as a competitor . . . .

Plaintiff is not being required to do the impossible: the Court will not expect to see offered into evidence a confession by one of the defendants that they all agreed they would stop at nothing until the old franchise abandoned the Houston wholesale TBA market. But, plaintiff must be prepared to present evidence from which a reasoning jury could find that the object of the conspiracy was effectively to eliminate the old franchise.

The Court will order the preparation of an extensive pretrial order in this case. When, pursuant thereto, the factual allegations of plaintiff are well organized and completely laid out, the Court will consider whether plaintiff's evidence of the requisite intent is substantial or whether summary judgment must be granted in defendants' favor. Cf. Scott Medical Supply Co. v. Bedsole Surgical Supplies, Inc., 488 F.2d 934 (5th Cir. 1974).

## VII. THE FOURTH ELEMENT: MARKET POWER

*Whitten* not only contributed to the conclusion that the requisite intent under *Pick-Barth* must be one presenting a strong threat to competition without any meaningful possibility of being reasonable under the circumstances. The opinion in *Whitten* also distinguished *Pick-Barth* and *Atlantic Heel* in a way which encouraged this Court to inquire whether a fourth essential element must be added to plaintiff Tower Tire's cause of action.[16] The *Whitten* Court indicated that each of its earlier decisions involved "a defendant which was a significant factor in the market". *Whitten,* supra, 508 F.2d at 562. This statement by the Court of Appeals prompted this Court to request the parties now before it to state whether plaintiff's cause of

action did not include an additional element. Not surprisingly, the defendants agreed that the above quoted comment indicated that a fourth element concerning the market power of the defendants must be included. Plaintiff disagreed but contended that this element could be established easily in this case.

Plaintiff's basic objection to adding a fourth element to its cause of action is that in only one case in this field—*Pick-Barth*—was the defendant a significant factor in the market.[17] Plaintiff protests the illogic of requiring proof that the plaintiff in a *Pick-Barth* case was a significant factor in the relevant market. Tower Tire contends that the monopolistic tendency of a conspiracy to employ unfair trade practices to destroy a competitor conceivably could vary according to the market power of the conspirators, but never according to the market power of the "victim".

The difficulties which surround the employment of a market power or market share test in other areas of *per se* violations caution against any unnecessary decisions or even comments on the subject at this time. Cf. Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 509, 89 S.Ct. 1252, 22 L. Ed.2d 495 (1969) (dissenting opinion of White, Justice); United States v. First Nat'l Bank & Trust Co. of Lexington, 376 U.S. 665, 673, 84 S.Ct. 1033, 12 L. Ed.2d 1 (1964) (dissenting opinion of Harlan, Justice). It may be that the facts of this case will require no refinement of the standard identified by the *Whitten* Court. This Court notes simply that the participation of defendant Arco in the alleged conspiracy may, by itself, put an end to any doubt as to the significance of the defendants in the market. Arco's role in the TBA distribution in question may be the functional equiva-

---

16. The three elements generally agreed upon by the parties were: (1) the existence of an agreement, combination or conspiracy; (2) the use of unfair methods of competition as a part thereof; and (3) the requisite intent.

17. In so contending, plaintiff directly contradicts the crucial statement in *Whitten*. In fact, it is only by implication that the opinion in *Atlantic Heel* anywhere reveals that the defendant was a significant factor in the market.

lent of the "unique attractiveness" of the tying product in *Fortner,* supra, 394 U.S. at 499, 89 S.Ct. 1252, or the market shares of the merging banks in *Lexington,* supra, 376 U.S. at 668–69, 84 S.Ct. 1033.

## VIII. THE SEPARATE DEFENSE OF DEFENDANT ARCO

Defendant Arco urges upon the Court as grounds for summary judgment in its favor an argument uniquely its own. Arco points to its fundamentally vertical relationship to the franchises and quotes Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283, 287 (6th Cir.), cert denied, 375 U.S. 922, 84 S.Ct. 267, 11 L. Ed.2d 166 (1963) for the proposition that "[t]he substitution of one distributor for another . . . does not eliminate or materially diminish the existing competition [and] is not an unreasonable restraint of trade." Cf. B & B Oil & Chem. Co. v. Franklin Oil Corp., 293 F. Supp. 1313 (E.D.Mich.1968).

Plaintiff's response to this argument is manifold. First, plaintiff asserts, without contradiction, that defendant Arco also had a horizontal relationship with the old franchise: that Arco offers Goodyear TBA at wholesale on the same market Greater Houston did.[18] Indeed, plaintiff alleges Arco now sells Goodyear TBA directly to one of the old franchise's best customers. Cf. Marder v. Conwed Corp., 378 F.Supp. 109 (E.D. Pa.1974).

Second, plaintiff asserts that, because of a bonus system employed by the manufacturer, Goodyear, Arco competed in a unique way with Greater Houston despite their vertical relationship. The Court is presently unclear on the workings of the bonus system, but the gist of

plaintiff's allegation has not been denied.

To these arguments may be added a third. The manufacturer/distributor cases apparently never did hold that a vertical realignment was immune to the extent that it could be employed as a part of a broader conspiracy to violate the antitrust laws with impunity. For example, it was recently said in Varney v. Coleman, 385 F.Supp. 1337 (D.N.H. 1974), that "[i]t is settled law that a manufacturer may terminate a distributor without violation of the antitrust laws *if* the decision to terminate is based on a reasonable and legitimate business decision." *Varney,* supra, at p. 1341 (emphasis supplied).[19] Thus, the instant case is more in line with De Filippo v. Ford Motor Co., 378 F.Supp. 456 (E.D.Pa.1974). There the court held that a claim charging a concerted refusal to deal in violation of Section 1 of the Sherman Act was distinguishable from the change-of-distributor cases because it presented "a situation in which a group of plaintiff's competitors combine[d] with a manufacturer to interfere with plaintiff's attempt to secure a distributorship." *De Filippo,* supra, at p. 466.

For all these reasons, defendant Arco's alternate ground in support of its motion for summary judgment cannot be accepted.

## IX. CONCLUSION

As indicated, no basis has been found upon which summary judgment in favor of any defendant can be granted at this time. Order shall enter accordingly and the parties will be directed to proceed with the preparation of a pretrial order as described in Part VI, supra.

---

18. Cf. Wilson v. I.B.E. Industries, Inc., 510 F.2d 986 (5th Cir. 1975) wherein the Court, in a context only slightly different from that presented by the instant case, emphasized that the defendant was "a wholesale distributor that does not compete with its own retailers for customers." *Wilson,* supra, at 988.

19. Cf. *Wilson,* supra, 510 F.2d at p. 989, where the Court said,

[A] distributor may discontinue dealing with a particular retailer for business reasons which are sufficient to the distributor, and adverse effect on the business of the retailers is immaterial *in the absence of any arrangement restraining trade.* (emphasis supplied).