**ASSOCIATED RADIO SERVICE COMPANY and Associated Radio Company**

v.

**PAGE AIRWAYS, INC., et al.**

**Civ. A. No. 3–7838–F.**

United States District Court,
N. D. Texas,
Dallas Division.

June 10, 1976.

Joe W. Matthews, Dallas, Tex., John N. McCamish, Jr., San Antonio, Tex., Richard S. Chambers, Dallas, Tex., for plaintiffs.

John L. Hauer, Robert E. Goodfriend, Clarice M. Davis and W. Michael Bonesio, Dallas, Tex., for Page Airways and Page Gulfstream.

D. L. Case, Dallas, Tex., for Chapin and Hamilton.

Jay Vogelson, Dallas, Tex., for Douglas Juston.

### MEMORANDUM ORDER

ROBERT W. PORTER, District Judge.

## I. NATURE OF THE CONTROVERSY

Associated Radio Service Company (Service) and Associated Radio Company (Radio) bring suit against Page Airways, Page Gulfstream, Douglas Juston, Ross C. Chapin and Edwin C. Hamilton alleging violations of the Sherman Act, Sections 1 and 2 [15 U.S.C. §§ 1, 2]. Radio Company purchases for resale avionic equipment to be used on corporate or private aircraft. Service Company designs and installs avionic systems and custom interiors for corporate and private aircraft purchasing its supplies from Radio Company.

In 1968, Service Company expanded its operations to San Antonio, Texas, and entered into an agreement with Defendant Page Airways, whereby Service Company would design, and offer for sale and installation avionic equipment to prospective purchasers of Gruman Gulfstream aircraft concurrently with the sales efforts made by Page Airways to sell the unoutfitted aircraft. Plaintiffs allege, that in June, 1972, Defendants Page Airways and Page Gulfstream notified Service Company that they

were terminating their agreement with Service Company effective June 20, 1973 and that Defendants made a determination to begin their own avionic design and installation operations in San Antonio, Texas.

Plaintiffs further assert that about this time Defendants entered into an unlawful conspiracy to take control of Plaintiffs' business in San Antonio, Texas and to eliminate Plaintiffs as significant competitors in the interstate business of designing, marketing and installing avionic equipment in corporate and private aircraft. In furtherance of that conspiracy, Defendants are alleged to have committed the following wrongful and unlawful acts: enticing away Service Company's employees; causing and permitting the taking and destruction of Service Company's records and documents; causing and permitting Service Company's employees to withhold information from Plaintiff, causing and permitting the employees of Service Company to copy proprietary information for use by Defendants; causing and permitting the taking of equipment and records of Associated Page Interiors (API) [a company belonging in part to Service Company]; interfering with Plaintiff Service Company's mechanic's lien by obtaining an injunction from state court in San Antonio, Texas; refusing to pay Service Company that which it was owed; filing a spurious interpleader action; slandering Plaintiffs' credit; and causing API to vacate the lease in San Antonio and to fail to pay a debt owed to Service Company. Plaintiffs seek damages in excess of one million dollars for those acts which are alleged to be in violation of the antitrust laws of the United States.

Defendants, on March 16, 1976, moved to dismiss, or for summary judgment, and to stay the present proceedings. Further arguments are also made that in the event this Court decides this case against Defendants that certain questions be certified for appeal pursuant to Title 28 U.S.C. § 1292(b). Defendants' motions are directed at four distinct issues. First it is argued that this court has no jurisdiction under Section One

of the Sherman Act since the simple allegation of tortious conduct without a coincident allegation of "public injury"—anticompetitive effect in this case—contained in Plaintiffs' Complaint does not rise to the level of a Section One violation. Defendant also moves to dismiss all allegations based upon Section Two of the Sherman Act asserting that Plaintiffs have failed to allege any product or geographic market in which Defendants can properly be said to be "monopolizing" within the meaning of Section Two. Further, attacks are made by Defendants on Plaintiff Radio Company's standing to complain of antitrust violations which are alleged to have been directed at its subsidiary, Service Company. Finally, Defendants argue that antitrust allegations based upon Defendants' institution of legal proceedings in San Antonio state court should be dismissed under the *Noerr-Pennington Doctrine.*

For reasons set forth below the following decisions are reached with respect to each position advanced by Defendants.

1. Plaintiffs' have failed to plead a claim under Section One, although Plaintiffs may replead within 15 days of this order and must ultimately prove either that the particular conduct alleged in this case unreasonably restrains competition or, if Plaintiff wishes this Court to apply a per se analysis, that the alleged conduct is in general so anticompetitive that this Court would be correct in drawing an inference from it that anticompetitive effects will occur in most circumstances when such behavior recurs;

2. Defendants' Section Two motion to dismiss is held in abeyance until Plaintiffs submit to this Court within 15 days of entry of this order a detailed partial pre-trial order outlining each element of a Section Two violation which Plaintiffs will seek to prove, along with a resume of facts which will prove each element;

3. This Court will also hold Defendants' standing motion in abeyance until further clarification of this area by the Fifth Circuit which is expected to rule on

a similar matter before the end of August, 1976.[1]

4. Defendants' Motions to Dismiss based upon the *Noerr-Pennington Doctrine* are overruled.

5. No question will be certified for appeal pursuant to Title 28 U.S.C. 1292(b).

## II. PICK–BARTH AND PROGENY

The question clearly presented by Defendants' Motion to Dismiss Plaintiffs' Section One claim is whether wrongful and unlawful conduct when coupled with a subjective intent to destroy a competitor violates Section One of the Sherman Act without further inquiry into the economic impact of such behavior. In antitrust argot the question is whether such behavior and intent are *per se* violations of the Sherman Act. Plaintiffs argue that a line of cases beginning with *Albert Pick-Barth Co. v. Mitchell Woodbury*, 57 F.2d 96 (1st Cir. 1932) (hereinafter referred to as *Pick-Barth)* properly characterize such actions and intent as *per se* violations of Section One. In *Pick-Barth* the Plaintiff alleged that the Defendant hired away key employees who took plaintiff's customer lists as well as other data and that all those actions were used to destroy plaintiff's business. The Defendant demurred and the district court held that "no offense under the anti-trust laws, in that there was no allegation of an unreasonable restraint of interstate commerce." *Id.* at 98. On appeal the First Circuit, in reversing the lower court, held that the complaint was sufficient to state a cause of action. After trial the Defendant appealed for a second time to the First Circuit urging that a *per se* rule should not have been applied in view of the jury's specific finding that the Defendant's acquisition of the plaintiff's business did not unreasonably restrain trade. This time,

in affirming the lower court, Judge Wilson narrowly held that it is unnecessary "to show an unreasonable restraint of interstate trade as an accomplished fact, if a conspiracy is proved, the intent and purpose of which, if carried out, would eliminate the largest competitor of one of the conspirators in a particular section of the country, which competitor controlled a substantial part of the trade in that section, and one of the methods of suppressing such competition was unlawful or unfair competition." *Id.* at 102. Reference is repeatedly made throughout the decision to the subjective intent of the Defendant "to eliminate by unfair means a competitor". *Id. Pick-Barth* has been read to characterize all tortious conduct when coupled with an intent to destroy as a *per se* violation of Section One of the Sherman Act.[2]

Two subsequent cases in the First and Tenth Circuits have all but recanted their support for the *Pick-Barth per se* rule. In *Whitten v. Paddock Pool Builders*, 508 F.2d 547 (1st Cir. 1974) the court reasoned that the difficulty of defining with any precision the practices held to be *per se* under the *Pick-Barth* doctrine may lead to four difficulties: (1) the implications of judicial crime making in an area not susceptible of neutral definition; (2) a reluctance to create a federal common law of unfair competition; (3) a fear of encompassing within the prohibitions of the Sherman Act conduct which fosters, rather than reduces, competition; and (4) a total lack of Supreme Court precedent or prior judicial experience with the economic consequences of competitive business torts. *Id.* at 560. In spite of such considerations however, the First Circuit continues to recognize a restricted *per se* rule when an effort is made to eliminate a competitor which is a significant factor in the market. *Id.* at 562. See

1. The two decisions which are being considered by the Fifth Circuit are *Yarn Processing v. Leesona*, 74–2835 and *Yoder Brothers v. California Florida Plant Corp.*, 75–2141.

2. See *Atlantic Heel Co. v. Allied Heel Co.*, 284 F.2d 879 (1st Cir. 1960); *Vogue Instruments Corp. v. Lem Instruments Corp.*, 40 F.R.D. 497

(S.D.N.Y.1966); *Metal Lubricants Co. v. Engineered Lubricants Co.*, 411 F.2d 426 (8th Cir. 1969); *Frederick Chusid & Co. v. Marshall Leeman & Co.*, 326 F.Supp. 1043 (S.D.N.Y.1971); *duPont Waltson, Inc. v. E. F. Hutton & Co.*, 368 F.Supp. 306 (S.D.Fla.1973).

also *Tower Tire and Auto Center v. Atlantic Richfield*, 392 F.Supp. 1098 (S.D.Tex. 1975). Interpreting its prior citation of the *Pick-Barth* case in *Perryton Wholesale v. Pioneer Distributing Co.*, 353 F.2d 618 (10th Cir. 1965) the Tenth Circuit in *Craig v. Sun Oil Co. of Pa.*, 515 F.2d 221 (10th Cir. 1975) completely rejected the application of the *per se* analysis in the business tort situation and thus ended all support for any *per se* rule in such cases. Thus only *Pick-Barth*, qualified and narrowed by *Whitten*, remains as slim but legitimate support for Plaintiffs' proposition that economic effect need not be pleaded nor proven in this case.

Two district court cases in the Fifth Circuit have recently grappled with the extent to which the *per se* analysis should be applied to the *Pick-Barth* situation in light of the First Circuit's new analysis in *Whitten.* In *Tower Tire and Auto Center v. Atlantic Richfield Co., supra*, Judge Noel reasons persuasively that *Whitten* simply focused more sharply on the intent element in the *Pick-Barth* type case and refined that element to require a specific finding of fact that the defendant intended effectively to eliminate the plaintiff from the relevant market. *Id.* at 1107. Judge Noel also required that the defendant be shown to be a significant factor in the market. Judge Moye in *Southland Reship v. Flegel*, 401 F.Supp. 339 (N.D.Ga.1975) seems to reach the same result as that in *Tower Tire, supra*, when he concludes that *per se* analysis may have some applicability when there exists a conspiracy among those who have the purpose, power or the effect of completely eliminating a competitor. *Id.* at 1108.

Having thus reviewed the rule in *Pick-Barth* as well as having noted its limited acceptance, I reject, on the present state of the record, any application of *per se* analysis in the present case. There is no use to be served by requiring a limited inquiry into the power of a firm, its intent and

motive without also considering other, and perhaps hitherto overlooked variables, which will give the Court a more solid basis on which to label the conduct alleged an unreasonable restraint of trade. Analysis of the ebb and flow of *per se* application in other types of antitrust violations lends support to a more extended inquiry in this case.

## III. THE MEANING OF PER SE?

■ As observed by Professor Blake, "an enormous amount of sterile controversy has been generated over whether certain types of offenses should be subject to *per se* treatment or to the rule of reason. In general, the use of those labels impedes clear thinking. The real issue is whether the judicial investigation should consider all possible relevant facts or whether certain facts simply may be ignored or presumed to exist." H. Blake and R. Plitofsky, *Antitrust Law Cases and Materials*, p. 492, *University Case Book Series* (1967). More specifically the issue in this case is whether one can infer from the hodge-podge of business torts alleged by the Plaintiff an anticompetitive effect. The precise relationship between the use of the unlawful business tort and anticompetitive effect is simply not generally available, even if known.[3] See e.g. R. Posner, *Exclusionary Practices and the Antitrust Laws*, 41 U.Chi.L.Rev. 506 (1974). A large body of economic teaching indicates that the power a firm has dictates the kind of conduct or behavior we should come to expect and hence *per se* rules directed solely at conduct and not structure would serve no useful purpose. F. Schere, *Industrial Market Structure and Economic Performance*, at 5 (1970). There are others who urge that both structure and conduct contribute to the ultimate performance of the economy but that both operate more or less independently of one another with different economic concentrations coincident

---

**3.** I note that often "practical men who believe themselves to be quite exempt from any intellectual influences are usually the slaves of some defunct economist . . ." J. Keynes, *The General Theory of Employment, Interest* *and Money*, (1936), and therefore I am hesitant to categorize the acts, as alleged, a *per se* violation without further and hopefully vital instruction.

with but not necessarily dictated by behavior patterns and vice versa. Finally, at the other extreme from the structuralists are the behaviorists who concentrate solely on conduct as the factor which most affects structure and hence performance. See generally, A. Phillips, Commentary, *Industrial Concentration: The New Learning*, 409 (ed. H. Goldshmid, H. Mann, J. Weston). To focus on conduct, the business tort and the alleged intent or motive of the defendant in this case, without inquiry into the ultimate anticompetitive effect each may have on the economy is simply unjustified on the present state of the record. See *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). It would be useless to fashion a *per se* rule which would punish all conduct of a particular type if such punishment did not deter future violations. If conduct is unrelated to power, the *per se* rule should not contain an analysis of power but should simply outlaw the prescribed conduct from both the large and the small firm. Likewise if the reverse is true then a power element should be included in any *per se* rule which is finally fashioned. See *Fortner Enterprises v. U. S. Steel*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969).

A review of the development of the *per se* concept indicates that the courts have tended to require a mixture of power, motive, intent and clearly definable conduct before classifying behavior as a *per se* violation. See generally, J. Cise, *The Future of Per Se in Antitrust Law*, 50 Va.L.Rev. 1165 (1964). For example, in *United States v. Trenton Potteries Co.*, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927) the Court proceeded from the premise that "the aim and result of every price-fixing agreement . . . is the elimination of one form of competition" to the conclusion that "agreements which create such potential power may well be held to be in themselves unreasonable or unlawful restraints . . .." It is conduct, power and intent which create the conditions which, once identified, made price fixing a *per se* violation. In theory, neither puny power nor munificent motives will justify violation of a *per se* rule once

established and violated. See e.g. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, n. 59, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *Kiefer-Stewart v. Joseph E. Seagram & Sons*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); *United States v. Topco Associates*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) (Blackmun, J. concurring).

In *United States v. Container Corporation of America*, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969), the Court, reviewing the dismissal of the Government's complaint which alleged that the agreement to exchange price information and not an agreement to fix prices was a *per se* violation of Sherman Act, Section One, held that the continuation of some price competition was not fatal to the Government's case. The exchange of price information, while not always anticompetitive, was said to be anticompetitive in an industry dominated by few sellers in which the quantity of goods ordered varied explosively with price changes. Mr. Justice Marshall, dissenting in that case, reasoned that: "*Per se* rules always contain a degree of arbitrariness. They are justified on the assumption that the gains from imposition of the rule will far outweigh the losses and that significant administrative advantages will result. In other words, the potential competitive harm plus the administrative costs of determining in what particular situations the practices may be harmful must far outweigh the benefits that may result. If the potential benefits in the aggregate are outweighed . . . then they are simply not worth identifying in individual cases." He then analyzed the purpose, of the alleged scheme, the number of producers, their concentration, the barriers to entry, in arguing that the danger of the exchange of price information was too slight on the facts before him to impose a *per se* rule. The conflicting points made by Justices Douglas and Marshall represent a model of inquiry into the facts which determine whether a particular type of conduct should be classified as a *per se* violation or not.

Contrasting the analysis in *Container Corp., supra*, is that in *Pick-Barth, supra*,

which ignores traditional *per se* economic inquiry into whether an inference of anti-competitive effect should be raised by the defendant's unfair competitive practices. Simple conclusory statements that an anti-competitive effect will follow the unlawful intent and conduct, begs the threshold and critical question of whether the alleged intent and conduct does in fact have an anti-competitive effect. It is the logical inference raised by proving one set of facts, intent and conduct, which allows one to assume without further inquiry, another set of facts, anticompetitive effect. For example, in *Klor's v. Broadway-Hale Stores*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) the Court, applying an historical analysis, reviewed all boycott situations which had come before it before classifying the boycott as conduct to which the *per se* rule should be applied. It then held that the destruction of one small business would be as much a violation of Section One as the destruction of a much more significant part of the economy. *Id.* 359 U.S. at 213, 79 S.Ct. 705. From conduct—the boycott—the Court inferred general economic harm; further inquiry into the scope of that harm was unnecessary and inconsistent with the premise on which the *per se* concept is founded.

Because of the severe limitation a *per se* classification places upon a court's analysis of the relative merit of a particular type of behavior, *United States v. Topco Associates, Inc.*, 405 U.S. 596, 612, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) (Blackmun, J., concurring), the courts have been hesitant to extend the *per se* rule to new types of behavior.[4] I heed that hesitancy and without intimating a decision on whether the facts as alleged in this case may yet be classified as *per se* violations, refuse to apply a *per se* test at this time. *White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). I also refuse to accept

Defendants assertions that the use of the business tort which is ostensibly used to add a competitor to the market place in this case cannot as a matter of law be an unreasonable restraint of trade. But see, *Southland Reship v. Flegel, supra.* Again, at the risk of being redundant, the precise relationship between the use of the business tort and resultant anticompetitive effect is simply not yet a matter of record and therefore is properly a question of fact to be determined at trial.

## IV. NOERR–PENNINGTON DOCTRINE

Next Defendants urge this Court to dismiss under the Noerr-Pennington Doctrine those portions of Plaintiffs' Second amended Complaint which allege that Defendants violated the antitrust laws by seeking an *ex parte* injunction as well as by filing one spurious interpleader action in state court. Analysis of that Doctrine and its application to this case properly begins with Mr. Justice Black's decision in *Eastern Railroad Presidents Conference v. Noerr Motor Freight*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), where the court held that concerted efforts to induce governmental action do not violate the antitrust laws regardless of their anticompetitive purpose or effect. The truckers in that case sued the railroads for launching what the truckers describe as a "vicious, corrupt and fraudulent" campaign to foster the adoption and retention of laws destructive of the trucking business. In the Supreme Court, the truckers argued in support of the judgment obtained in the district court that the activity in question lost its constitutional protection from the antitrust laws because the railroad's "sole purpose in seeking to influence the passage and enforcement of laws was to destroy the truckers as competitors for the long-distance freight business." *Id.* 365 U.S. at 138, 81 S.Ct. at 530. In rejecting this argument and reversing

---

4. See *Whitten v. Paddock Pool Builders*, 508 F.2d 547, 561 (1st Cir. 1974); *Harrison v. Prather*, 435 F.2d 1168 (5th Cir. 1970); J. Boone, *Single-Corporation Competitive Torts and the Sherman Act: A Projection Based Upon A Review of the Albert-Pick, Atlantic Heel and Perryton Cases*, 2 Ga.L.Rev. 372 (1968); Note, *Unfair Competition Under the Sherman Act: L. Albert Sauter v. Richard S. Sautor Co. and the Pick-Barth Rule*, 59 Iowa L.J. 1194 (1974).

the judgment below the Supreme Court stated:

> But we do not see how this fact, even if adequately supported in the record, could transform conduct otherwise lawful into a violation of the Sherman Act. All of the considerations that have led us to the conclusion that the Act does not apply to mere group solicitation of governmental action are equally applicable in spite of the addition of this factor. The right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws cannot properly be made to depend upon their intent in doing so. It is neither unusual nor illegal for people to seek action on laws in the hope that they may bring about an advantage to themselves and a disadvantage to their competitors. *Id.* 365 U.S. at 138–39, 81 S.Ct. at 530.

The Court also rejected as "legally irrelevant" Plaintiff's argument that Defendants' conduct was within the coverage of the antitrust laws because the campaign involved "unethical conduct". *Id.* 365 U.S. at 141–42, 81 S.Ct. 523. The only concession the Court was willing to make to Plaintiffs' position concerned the hypothetical situation where the effort to influence governmental action was shown to be a mere "sham" or pretext for an attempt to interfere directly with a competitor's business. As the Court stated:

> There may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified. *Id.* 365 U.S. at 144, 81 S.Ct. at 533.

■ *Noerr* was followed by the decision in *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). There the Court reversed a judgment against the United Mine Workers for alleged violations of the antitrust laws because some of the evidence involved constitutionally protected activity: approaches made by union officials to the Secretary of Labor and other government officials. The district court had apparently determined that *Noerr* was inapplicable where the constitutionally protected conduct was part of a larger conspiracy "to drive small operators out of business", *Id.* 381 U.S. at 670, 85 S.Ct. at 1593, and had so instructed the jury. In reversing, the Court of Appeals, which had affirmed the district court, the Supreme Court reaffirmed its position in *Noerr* that anticompetitive intent does not impair the protected character of this conduct. As the Court stated:

> Joint efforts *to influence* public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act. *Id.* 381 U.S. at 670, 85 S.Ct. at 1593 (emphasis supplied)

Finally, in *California Transport v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), the Supreme Court held that the *Noerr-Pennington* doctrine applied to litigants who invoked the aid of administrative agencies or courts as well as those who approached legislative bodies. As Mr. Justice Douglas stated, speaking for the Court:

> The same philosophy governs the approach of citizens or groups of them to administrative agencies (which are both creatures of the legislature, and arms of the executive) and to courts, the third branch of Government. Certainly the right to petition extends to all departments of the Government. The right of access to the courts is indeed but one aspect of the right of petition. *Id.* 404 U.S. at 510, 92 S.Ct. at 611.

The Court went on to say that it would be destructive of constitutional rights to hold that groups with common interests could not, without running afoul of the antitrust laws, advocate their points of view on economic matters that concerned their competitors. *Id.* 404 U.S. at 510–11, 92 S.Ct. 609. The Court recognized, however, as it had in *Noerr*, that immunity should not be extend-

ed to illegal and reprehensible practices such as perjury, fraud, conspiracy with or bribery of government decision makers, and misrepresentation. *Id.* 404 U.S. at 513, 92 S.Ct. 609. The critical distinction drawn by the Court in *California Transport* is between the concerted effort to influence public officials regardless of intent and purpose and the concerted effort to abuse the judicial or administrative process. *Id.* 404 U.S. at 513, 92 S.Ct. 609. Those efforts to influence public officials are granted immunity while those efforts to abuse the process are not. *Id.* The Court concludes that the line between intent to influence and intent to abuse is a difficult one to draw. *Id.* It is however, the drawing of that line which must be done in this case.

Defendants argue that there can be no abuse of the legal process within the meaning of *California Transport* unless it is shown that the actions taken by the Defendants are baseless and were instituted without probable cause or, in other words, that a case can be made that Defendants maliciously prosecuted the state court action. Reasoning from the malicious prosecution analogy, Defendants urge that filing one state suit, which has not yet come to trial, is insufficient as a matter of law to constitute abuse of the legal process and should be dismissed. One suit it is argued does not amount to harassment especially when the merit of that yet untried state claim cannot be finally and properly determined until it is tried.

■■■ While useful in some fact situations, Defendants analogy to malicious prosecution is not determinative. The gist of the exception to *Noerr-Pennington* immunity further articulated in *California Transport* is abuse of the legal process and not specifically the tort of malicious prosecution. As such, the baselessness of the claims made in prior proceeding is only one aspect of various possible abuses of the legal process. The gravamen of the "tort" abuse of process is the initiation of a legal

proceeding against an individual to secure an objective other than the judgment purportedly sought in that proceeding. See Restatement § 682; Comment, *Limiting the Antitrust Immunity for Concerted Attempts to Influence Courts and Adjudicatory Agencies: Analogies to Malicious Prosecution and Abuse of Process*, 86 Harv.L. Rev. 715, 732 (1974) (hereinafter referred to as Analogies). While "abuse of legal process" as used generically in *California Transport* may be broad enough to include the tort of malicious prosecution, there can be no doubt that it also includes the narrower and conventional tort, abuse of process. Therefore, Plaintiff need only show that the Defendant instituted litigation with the *purpose* of achieving a collateral and unlawful objective to that appearing on the face of the suit and that he committed specific acts—other than those acts incidental to the normal use of the Courts—directed at attaining that objective. *Analogies*, 86 Harv. L.Rev. at 732. Cf. *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973).

■■■ In the case now before the Court, it is alleged that the purpose of Defendants' state prosecutions was to destroy Plaintiffs; there can be no doubt from Plaintiffs allegations, which for the purposes of this order must be assumed to be true, that Defendants were attempting to manipulate the court system to strangle Plaintiffs' source of funds. Because the Noerr-Pennington doctrine does not extend immunity to such abusive acts, Defendants' Motion to Dismiss is overruled, as is Defendants' Motion to Stay these proceedings pending the outcome of the state cause of action.

## V. MOTIONS HELD IN ABEYANCE

Finally, Defendants move on two more fronts to dismiss Plaintiffs' claims. In one argument Defendants submit that Radio Company has no standing to complain of alleged acts ostensibly directed at Service Company which are said to be in violation of the federal antitrust laws.[5] In its second

---

5. Standing arguments are also urged with respect to claims made on behalf of API which are also held in abeyance.

 

argument, Defendants claim Plaintiffs simple allegation that the Court has jurisdiction under Section Two of the Sherman Act is insufficient as a matter of law to state a cause of action under Section Two. After full consideration of the relevant law on both of those points I have decided to hold in abeyance both motions pending the further ripening of each. As to the standing motions, I am advised that the Fifth Circuit is reevaluating the "target area approach" as set out in *Jeffrey v. Southwestern Bell,* 518 F.2d 1129 (5th Cir. 1975) in view of the broader notions of standings expressed in *Malamud v. Sinclair Oil Corporation,* 521 F.2d 1192 (6th Cir. 1975). A decision by this Court, which might later have to be undone would serve little purpose beyond perhaps delaying the ultimate date of trial. Therefore this action will proceed with all parties and claims presently joined until further clarification of this area by the Fifth Circuit.[6]

With respect to Defendants' Section Two claim, further refinement of Plaintiffs' pleadings is indeed called for. Therefore I require below that Plaintiffs submit within 15 days of this order a partial pre-trial order outlining each element of Plaintiffs' Section Two claim and a resume of the facts which will purportedly prove each element of that claim. Further consideration of Defendants' Motion to Dismiss will commence once Plaintiffs submit that order.

At this point it is therefore ORDERED:

1. That Plaintiffs' Section One claim is dismissed but Plaintiff is hereby granted leave to amend and replead within fifteen (15) days of this order;

2. That Plaintiffs submit to this Court within fifteen (15) days of entry of this decision a detailed partial pre-trial order outlining each element of its Section Two claim along with a resume of facts which purportedly prove such element;

3. That this Court will hold Defendants' standing motions in abeyance until further clarification of this area by the Fifth Cir-

cuit which is expected to rule on a similar matter before the end of August, 1976;

4. That Defendants' Motion to Dismiss and for Summary Judgment based upon the Noerr-Pennington Doctrine is overruled.

5. Finding that the standards for certification for appeal pursuant to Title 28 U.S.C. § 1292(b) have not been met, Defendants' Motion to Certify is overruled.

It is so ORDERED.

---

6. See supra note 1 for the two cases presently pending before the Fifth Circuit on this point.